COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone 602•252•8400
Cindy C. Albracht-Crogan (020336)
Email: ccrogan@cdqlaw.com
Kaysey L. Fung (032585)
Email: kfung@cdqlaw.com

**MCCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275
Richard D. McCune, CA State Bar No. 132124*
Email: rdm@mccunewright.com
David C. Wright, CA State Bar No. 177468*
Email: dcw@mccunewright.com

**MCCUNE WRIGHT AREVALO, LLP**
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161
Emily J. Kirk, IL Bar No. 6275282*
Email: ejk@mccunewright.com

* *Pro Hac Vice* application to be submitted
  Attorneys for Eva Cornell and the Putative Class

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| EVA CORNELL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DESERT FINANCIAL CREDIT UNION, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1. Eva Cornell ("Plaintiff") brings this lawsuit against Desert Financial Credit Union ("DFCU" or "Defendant") on behalf of DFCU's members, on the basis that DFCU has violated and continues to violate Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq.*, ("Reg E" or "Regulation E"). Regulation E requires that before financial institutions may charge overdraft fees on one-time debit card and ATM transactions, they must (1) provide a complete, accurate, clear, and easily understandable disclosure document of their overdraft services (opt-in disclosure agreement); (2) provide that disclosure as a stand-alone document not intertwined with other disclosures; and (3) obtain verifiable affirmative consent of a customer's agreement to opt into the financial institution's overdraft program.

2. Specifically, in order to comply with Regulation E requirements, DFCU provides its members with a Regulation E opt-in disclosure agreement that describes the credit union's overdraft service under the title **"WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES"** (emphasis in original).[1] DFCU's Regulation E opt-in disclosure agreement, however, provides members with ambiguous and misleading language that misrepresents the circumstances under which DFCU will charge the member an overdraft fee. The opt-in disclosure agreement does not disclose DFCU's use of an internal artificial account balance to determine if a debit card or ATM transaction will be considered overdrawn (*i.e.* "available balance"), instead of the official and actual balance of the account. Not only does DCFU not disclose its use of the available balance to assess overdraft fees, it describes an overdraft using language conveying that DFCU uses a member's actual balance instead of the artificial available balance to assess overdraft fees.

3. Because Regulation E does not permit financial institutions to charge overdraft fees until they obtain affirmative consent from customers through an accurate disclosure of their overdraft practices in a stand-alone opt-in disclosure agreement, DFCU's

---

[1] See DFCU's opt-in disclosure agreement titled **"WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES"** attached hereto as **Exhibit A** (emphasis in original).

1

assessment of all overdraft fees against members for one-time debit card and ATM transactions has been and continues to be illegal.  Further, DFCU's continued use of a non-conforming disclosure agreement to "opt-in" new members to its overdraft service is invalid.

4.      Regulation E provides a cause of action against financial institutions that fail to abide by its requirements.  Plaintiff thus seeks statutory damages, as well as the return of improperly charged overdraft fees within the applicable statute of limitation periods.  Plaintiff also seeks to enjoin DFCU from continuing to obtain new members' "consent" to be assessed overdraft fees by using an opt-in disclosure agreement that violates Regulation E, and from continuing to assess any further overdraft fees on Regulation E transactions until it obtains the consent of current members using a Regulation E-compliant opt-in disclosure agreement.

## NATURE OF THE ACTION

5.      All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel.  Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as well as Plaintiff's or counsel's own investigation.   Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

6.      Plaintiff has brought this class and representative action to assert claims in her own right, as the class representative of all other persons similarly situated.  Regulation E requires DFCU to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging members an overdraft fee on one-time debit card and ATM transactions.  Because of the substantial harm to consumers of significant overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all mandated overdraft information in one clear and easily understood document.  Financial institutions are not permitted to circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials.  Regulation E expressly requires a financial

COHEN DOWD QUIGLEY

institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with account holders regarding the institution's overdraft policies.

7.    DFCU does not meet this requirement.  It uses an opt-in disclosure agreement that misleadingly and/or ambiguously describes the circumstances in which DFCU charges an overdraft fee on a transaction. Specifically, DFCU defines an overdraft in its opt-in disclosure agreement as occurring when there is not enough money in the account to cover a transaction, but DFCU pays it anyway. But DFCU's automated decision to assess overdraft fees is not based on whether there is enough money in the actual account balance to cover the transaction. Instead, DFCU calculates account balances for overdraft purposes using an artificially reduced calculation created by DFCU's own internal bookkeeping called the "available balance," which deducts any money it unilaterally decides should be held for future transactions.  When these future holds are accounted for, the calculation often results in a negative "available balance" existing only on paper, even though there is actually money in the account to cover a transaction without a negative account balance at the time of payment and posting. While that practice is unfair on its face, the disclosure of the practice is at issue, not the practice itself.

8.    Accordingly, DFCU's opt-in disclosure agreement not only fails to accurately disclose to members which balance is used to assess an overdraft fee (which failing to disclose in a clear and understandable way is all that is required for a Reg E violation), it suggests that its overdraft policies apply an account holder's actual balance when determining whether to charge an overdraft fee, when it actually uses a different, artificially lower balance.

9.    DFCU's use of the artificially reduced account balance instead of the actual account balance to determine whether to assess overdraft fees is material. Based on analysis with other financial institutions, it is likely DFCU assessed overdraft fees on 10-20% more Regulation E overdraft transactions than would otherwise be the case if it used the actual balance to determine if an account was overdrawn.

10.    Plaintiff has been harmed by DFCU's Regulation E violation.  She was opted-in to the disclosure agreement using the ambiguous, inaccurate, and misleading description of DFCU's overdraft practices, and has been assessed overdraft fees on Reg E transactions that were not permitted because DFCU had earlier obtained Plaintiff's "consent" using a noncompliant Reg E opt-in disclosure agreement.   This action seeks statutory damages under Regulation E, as well as monetary damages, restitution, and injunctive relief due to, *inter alia*, DFCU's policy and practice of obtaining "affirmative consent" using a noncompliant opt-in disclosure agreement, unlawfully assessing and unilaterally collecting overdraft fees as set forth herein.

## PARTIES

11.    Plaintiff Eva Cornell is a resident of San Tan Valley, Arizona and a DFCU member at all relevant times to this Complaint.

12.    Based on information and belief, Defendant DFCU is a credit union with its headquarters and principal place of business in Phoenix, Arizona.  DFCU maintains over fifty branches throughout Arizona.

13.    Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations.  As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 100.

14.    Plaintiff is unaware of the true names of Defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or the Court.

15.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

COHEN DOWD QUIGLEY

4

16.    At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

17.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

18.    As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, and 28 U.S.C. § 1367(a).

20.    Venue is proper in this District because DFCU maintains its headquarters in this District, DFCU transacts business in this District, Plaintiff and similarly situated persons entered contracts with DFCU in this District, and DFCU executed the unlawful policies and practices which are the subject of this action in this District.

## BACKGROUND

**A.    Defendant DFCU**

21.    DFCU is a credit union headquartered in Phoenix, Arizona with approximately 52 branches and/or ATM machines throughout the state.  According to its financial filings, it reported having approximately 343,367 members and holding over $6 billion in assets.  DFCU reports that in 2019, it collected over $37.6 million in fee income, of which overdraft fees are believed to be a significant percentage.

5

22.     One of DFCU's main services is a share draft account, or checking account.[2] A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines.  Debits decreasing the amount in a checking account also can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases.  Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

23.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), DFCU assesses overdraft fees (a fee for paying an overdrawn item) and non-sufficient funds ("NSF") fees (a fee for a declined, unpaid returned item) to its members' accounts when it claims to have determined that an account has been overdrawn.

24.     The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the account holder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation.  The fee DFCU charges here constitutes very expensive credit in the overdraft context that harms the poorest customers and creates substantial profit.  According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[3]

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

---

[2]     This is a credit union's formal nomenclature for what is more commonly known as a "checking" account at banks.

[3]     https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited May 5, 2021).

COHEN DOWD QUIGLEY

- The transactions leading to overdrafts are often quite small.  In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.
- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added.)[4]

25.    Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions.  According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[5]

26.    Defendant's financial filings and practices reveal it has followed these trends to the letter.  Defendant charges an overdraft fee (which it refers to as a "Paid NSF Fee") of $35 per item.  But even if it had been properly charging overdraft fees, the $35 overdraft fee bears no relation to its minute risk of loss or cost for administering overdraft and non-sufficient funds services.  But an overdraft fee's practical effect is to charge those who pay them an interest rate with an APR in the thousands.

27.    Accordingly, overdraft fees are punitive fees rather than service fees, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee.  A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[6]  In a 2014

COHEN DOWD QUIGLEY

---

[4]    CFPB, *CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges* (7/31/2014)    https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited May 5, 2021).

[5]    Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited May 5, 2021).

[6]    Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012),    https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited May 5, 2021).

study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[7]  More than 50% of those assessed overdraft fees do not recall opting into an overdraft program, *id.* at p. 5, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id.* at p. 10).

28.    Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees.  Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees.  *Id.* at p. 3.  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  *Id.*  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  *Id.* at p. 4.  And non-whites are 83% more likely to pay an overdraft fee than whites.  *Id.* at p. 3.

### B.    Regulation E

29.    For many years, banks and credit unions have offered overdraft services to their account holders.  Historically, the fees these services generated were relatively low, particularly when methods of payment were limited to cash, check, and credit card.  But the rise of debit card transactions replacing cash for smaller transactions—especially for younger customers who carried lower balances—provided an opportunity for financial institutions to increase the number of transactions in a checking account that could potentially be considered overdraft transactions, and for which the financial institution could assess a hefty overdraft fee.  The increase in these types of transactions was timed perfectly for financial institutions, which faced falling revenue as a result of lower overall interest rates and the rise of competitive innovations such as no-fee checking accounts.  Financial institutions thus recognized in overdraft fees a new and increasing revenue stream.

---

[7]    Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited May 5, 2021).

30.     As a result, the overdraft process became one of the primary sources of revenue for financial depository institutions—banks and credit unions—both large and small.   As such, financial institutions became eager to provide overdraft services to consumers because not only do overdrafts generate revenue, they do so with little risk. When an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

31.     Using common understanding bolstered by DFCU's disclosures, an overdraft occurs when two conditions are satisfied.  First, the consumer initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction.   Second, the financial institution pays the transaction by advancing its own funds to cover the shortfall.  An overdraft, therefore, is an extension of credit. The financial institution advancing the funds, allows the account holder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[8]  The financial institution uses its own money to pay the transaction, on the assumption that the account holder will eventually cover the shortfall.

32.     Before the Federal Reserve amended Regulation E regarding requirements for overdraft services, many financial institutions unilaterally adopted internal "overdraft payment" plans.   Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would cover the overdraft while charging the standard overdraft fee.   Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning a $4 cup of coffee at Starbucks into a $40 cup of coffee.

---

[8]     For a thorough description of the mechanics of an "overdraft," *see* https://www.investopedia.com/terms/o/overdraft.asp (last visited May 5, 2021).

COHEN DOWD QUIGLEY

33.     The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs.  Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all.  It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from account holders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions.  After Regulation E's amendment, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the consumer opted into the financial institution's overdraft program.  Otherwise, the bank or credit union could either cover the overdraft without charging a fee, or direct the transaction to be denied at the point of sale.  Further, without the opt-in, the financial institution could not charge an NSF fee because denying an ATM withdrawal or one-time debit card purchase meant no transaction had ever taken place, and thus there was no transaction to return.

34.     After the CFPB's creation, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs.  Unsurprisingly, the CFPB found that overdraft programs had a series of problems.  The most pressing problem was that overdraft services were costly and damaging to account holders.  The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225.  The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income that should be attributed to overdrafts.  The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether

1    or not the consumer would be charged a fee."[9]

2    35.    Given the state of overdraft programs prior to Regulation E's amendment, it

3    is easy to understand why the Federal Reserve was concerned about protecting consumers

4    from financial institutions unilaterally imposing high fees.  Banks and credit unions in this

5    scenario had significant advantages over consumers when it came to imposing overdraft

6    policies.  By defaulting to charging fees for point-of-sale transactions, banks and credit

7    unions created for themselves a virtual no-lose scenario—advance small amounts of funds

8    (average $24) for a small period of time (average 3 days), then charge a large fee (average

9    $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting

10    in an APR of thousands of percent interest (using averages—17,000% APR), all while

11    assuming very little risk because only a very small percentage of overdraft customers fail to

12    repay an overdraft.

13    36.    Because of this, Regulation E does not merely require a financial institution to

14    obtain an opt-in disclosure agreement before charging fees for transactions that result in

15    overdrafts.  It also provides that the opt-in disclosure agreement must satisfy certain

16    requirements to be valid.  The agreement must be a stand-alone document, segregated from

17    other forms, disclosures, or contracts provided by the financial institution.  It must also

18    accurately disclose to the account holder the institution's overdraft charge policies.  The

19    account holder's choices must be presented in a "clear and readily understandable manner."

20    12 C.F.R. § 1005.4(a)(1).  The financial institution must ultimately establish that the account

21    holder has opted-in to overdraft coverage either through a written agreement, or through a

22    confirmation letter to the customer confirming opt-in if the opt-in has taken place by

23    telephone or computer after being provided a compliant opt-in disclosure agreement.

24    37.    In the wake of Regulation E, some financial institutions simply decided to

25    forego charging overdraft fees on non-recurring debit card and ATM transactions.  These

26

27    [9]    The Federal Reserve has previously noted that "improvements in the disclosures
provided to consumers could aid them in understanding the costs associated with
28    overdrawing their accounts and promote better account management."  69 Fed. Reg. 31761
(June 7, 2004).

COHEN DOWD QUIGLEY

COHEN DOWD QUIGLEY

include large (*e.g.*, Bank of America) and small (*e.g.*, One West Bank, First Republic Bank, and Mechanics Bank) banks.  However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals.  As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain affirmative consent from their accountholders before charging overdraft fees on eligible transactions.

38.    But charging these exorbitant penalty fees for the bank or credit union's small advance of funds to cover overdrafts was not where it stopped.  Many financial institutions began manipulating the process as to when they would consider a transaction an overdraft to further increase the profit generated by their overdraft programs.  They charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer, but assessed overdraft fees on transactions when they paid the transaction with the customers' money.  That is, the financial institution unilaterally decided the account was overdrawn not by the actual lack of funds in the account, but by whether the money in the account minus any holds the financial institution unilaterally decided to apply for future events was enough to cover an ATM or one-time debit transaction when these transactions came in for payment at some future date.

39.    Most banks and credit unions calculate two account balances related to their accounting of a customer checking account.  "Actual balance," "ledger balance," "current balance" or even "balance" are all terms used to describe the actual amount of the account holder's money in the account at any particular time.  In contrast, "available balance" is a term of art the financial industry uses to describe the balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[10]

40.    Although    financial    institutions    calculate    the    two    balances,    the

---

[10]    Some financial institutions use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds, and does not include debit holds.

actual/ledger/current balance of the money in the account is the official balance. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer—the official record of the account.

41.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual account balance or the "available balance" for overdraft and NSF assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed. Whether the financial institution uses the actual money in the account or some other artificial balance to assess overdraft fees, that is information the customer needs to understand the overdraft program.

42.     Many financial institutions use the "available balance" for overdraft assessment purposes because it is consistent with their self-interest because the available balance is always the same or lower, by definition, than the actual balance. The actual balance includes all money in the account. On the other hand, the available balance always subtracts any holds placed on the funds in the account that may affect the money in the account in the future. It never adds funds to the account. To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account. The financial institution's "hold" is merely an internal characterization the bank or credit union uses to categorize some of the money. All of the account holder's money remains in the account, even the money Defendant has defined as "held." The fact that the money has a "hold" on it does not mean it has been removed from the account.

43.     The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution and account holders. Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer. At all times,

the financial institution uses the customer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

44.    A hypothetical demonstrates what the financial institution does under these circumstances.  Suppose that an individual has $1,000.  The individual intends to use $800 of this amount to pay rent.  The individual then intends to use the other $200 to make his monthly car payment.  But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off.  The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill.  This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due.  And if the individual does find the additional $40 before paying the car payment, there will never be a problem.  If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill.  He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

45.    The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account.  Suppose the same individual put the $1,000 in his checking account under similar circumstances on the 27th of the month.  That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month.  The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee.  He approves the water bill payment, and it posts immediately.  Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account.  All three payments are made with the individual's own account funds.  The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive.  However, even if the customer does not transfer the

COHEN DOWD QUIGLEY

14

$40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it. Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

46. A financial institution using the "available balance" method of calculating overdrafts would come to a different conclusion. Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account. This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account. Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account. And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds. Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions. Thus, using the available balance, although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

47. Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts *without clear disclosure of that practice* likely violates Reg E and other state laws. For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft

15

programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[11]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[12]

48.    Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood.  As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated and explained in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution to charge that customer overdraft fees on one-time debit card and ATM transactions.  Either inaccurately or ambiguously describing the use of which balance a financial institutions uses as part of its overdraft practice violates the plain language of Regulation E.

**C.    DFCU's Regulation E Practices**

49.    DFCU opts members into its overdraft program using an opt-in disclosure

---

[11]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited May 5, 2021).

[12]    https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited May 5, 2021).

16

agreement titled, **"WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES."** (Ex. A.)  A reasonable member reading a disclosure agreement requiring a signature or acknowledgement, and which relates to overdrafts and overdraft fees and represents that it contains information the member needs to know about overdrafts and overdraft fees, would rely on the opt-in disclosure agreement without supplementing that knowledge with reference to other marketing materials and/or account agreement language relating to overdrafts.

50.     The opt-in disclosure agreement explained that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The agreement makes no reference to "available" balance, "available" funds or any description of how DFCU's internal hold policies affect the balance. The opt-in disclosure agreement instead only explains that an overdraft occurs when there is not enough "money in [the] account" and DFCU pays it from its own funds.

51.     By defining overdrafts in this way, it is reasonable and expected for account holders to understand that DFCU uses the actual balance and money in the account to calculate whether an overdraft has occurred.  Many courts have already found that failing to clearly and accurately describe an overdraft program in an opt-in disclosure agreement can constitute a Regulation E violation.[13]  By using inaccurate and/or ambiguous language to describe what constitutes an overdraft, DFCU failed to provide the clear and easily

---

[13]     *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38; 1243-45 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

COHEN DOWD QUIGLEY

1  understandable description of its overdraft services that Regulation E demands.

2        52.    Many institutions that use an account's "available" balance to calculate
3  overdrafts disclose it in a far more clear and specific manner than DFCU.  San Diego
4  County Credit Union, for example, defines an "overdraft" as when "the available balance in
5  your account is nonsufficient to cover a transaction at the time that the transaction posts to
6  your account, but we pay it anyway."  Synovus Bank defines an overdraft as when there is
7  not enough money in an account, but adds the additional caveat that it "authorize[s] and
8  pay[s] transactions using the Available Balance in [the] account," and then specifically
9  defines the Available Balance.  TD Bank's opt-in disclosure agreement states as follows: "An
10  overdraft occurs when your available balance is not sufficient to cover a transaction, but we
11  pay it anyway.  Your available balance is reduced by any 'pending' debit card transactions
12  (purchases and ATM withdrawals) and includes any deposited funds that have been made
13  available pursuant to our Funds Availability Policy."  Similarly, Communication Federal
14  Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not
15  have enough money in your account to cover a transaction, or the transaction exceeds your
16  available balance, but we pay it anyway.  'Available Balance' is your account balance less any
17  holds placed on your account."

18        53.    In addition, many financial institutions that use the actual balance to
19  determine whether an account is in overdraft (meaning it looks strictly at the amount of
20  funds in an account), such as, *e.g.,* MidFlorida Credit Union, use the same language as
21  DFCU, to reference the actual balance, not the available balance. *See*
22  https://www.midflorida.com/MidFlorida/media/Documents/Forms/Overdraft-Opt-In-
23  Form-1-11-17.pdf (last visited May 5, 2021) (explaining that the language "[a]n overdraft
24  occurs when you do not have enough money in your account to cover a transactions, but
25  MIDFLORIDA pays it anyway" refers to the "[a]ctual balance." Thus, if there is sufficient
26  money in the account to cover a transaction—even if the money is subject to a hold for
27  pending transactions— then the financial institution will not charge an overdraft fee.

28        54.    Here, DFCU's failure to accurately, clearly, and in an easily understandable

COHEN DOWD QUIGLEY

way identify the balance DFCU uses to assess overdraft fees in the stand-alone opt-in disclosure agreement results in its failure to obtain the appropriate affirmative consent necessary to opt members into its overdraft program.  DFCU has and continues to charge Plaintiff and Class Members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E.  Further, on information and belief, DFCU continues to "opt-in" new members to its overdraft program using the same improper opt-in disclosure agreement.

## FACTUAL ALLEGATIONS AGAINST DEFENDANT

55.    At all relevant times, DFCU used the "available balance," and not the actual account balance, to determine whether to assess overdraft fees on one-time debit card and ATM transactions.

56.    At all relevant times, DFCU knew or should have known, that in order to legally charge overdraft fees to members, it was required to first obtain affirmative consent from each member using a Regulation E compliant stand-alone opt-in disclosure agreement. Regulation E compliance requires, at a minimum, that a financial institution accurately disclose all material parts of its overdraft program and policies in the opt-in disclosure agreement in clear and easily understood language.

57.    At all relevant times, DFCU used an identical opt-in disclosure agreement to opt-in Plaintiff and all putative Class Members.  The agreement defined an overdraft as occurring "when you do not have enough money in your account to cover a transaction, but we pay it anyway."

58.    This definition of overdraft would disclose and be interpreted by reasonable members to mean as follows: (1) "not enough money in your account" means the Actual Balance/Current Balance/Ledger Balance in the account; (2) to "cover a transaction" means that the overdraft decision is made at time of posting and payment; and (3) "we pay it anyway" means that Defendant has advanced or loaned the customer money to pay the transaction.  However, as DFCU determines overdraft fees based on the "available balance" that factors in credit and debit holds, approximately 10-20% of overdraft fees are assessed

COHEN DOWD QUIGLEY

on transactions when there was money in the account to cover the transaction at the time it was posted and paid, and DFCU did not advance or loan the member any money to pay the transaction.

59.     By omitting any reference to "available balance" and by stating overdraft fees are determined based on whether there is "enough money in the account" (which indicates use of the actual account balance), the opt-in disclosure agreement misrepresents to members DFCU's actual practice of assessing overdraft fees.   The opt-in disclosure agreement did not accurately and/or in a clear and easily understandable way describe what constitutes an overdraft and under what circumstances the member would be assessed an overdraft fee. As such, the opt-in disclosure agreement did not comply with Regulation E's requirements and violated the Arizona Consumer Fraud Act ("ACFA").

60.     Because DFCU uses an opt-in disclosure agreement that does not accurately and clearly describe its overdraft practices and thus is not compliant with Regulation E and violates the ACFA, DFCU is not permitted to charge members overdraft fees on one-time debit card and ATM transactions, yet it does so anyway.

61.     At all relevant times, DFCU knew it was using the available balance to assess overdraft fees, and further knew or should have known that as a stand-alone document, its opt-in disclosure agreement was not providing an accurate, clear and easily understandable definition of an overdraft when it identified an overdraft as "when you do not have enough money in your account to cover a transaction, but we pay it anyway."

62.     At all relevant times, DFCU charged Plaintiff and the putative Class Members overdraft fees on one-time debit card and ATM transactions even though it did not comply with Regulation E to first obtain members' affirmative consent using a legal opt-in disclosure agreement before charging overdraft fees.

63.     Based on information and belief, DFCU continues to opt members into its overdraft program using a non-compliant opt-in disclosure agreement, and then charges those members overdraft fees on one-time debit card and ATM transactions.

COHEN DOWD QUIGLEY

64.   Based on information and belief, DFCU continues to charge existing members who had "opted-in" using that same non-compliant opt-in disclosure agreement overdraft fees on one-time debit card and ATM transactions.

### PLAINTIFF'S HARM

65.   Plaintiff has held an account with DFCU at all times relevant to the allegations, and opted into its overdraft program for her debit card and ATM transactions.

66.   As will be established using DFCU's own records, Plaintiff has been assessed numerous improper $35 overdraft fees on one-time debit card and ATM transactions including on May 14, May 15, May 16, May 19, and May 20, 2020.  Based on information and belief, those overdraft fees have not been refunded to Plaintiff.  DFCU assessed each of these fees although it used its non-compliant opt-in disclosure agreement to garner Plaintiff's affirmative consent to be charged these fees.  Thus, DFCU was not permitted to charge Plaintiff these fees.

67.   The extent of improper charges DFCU assessed upon Plaintiff and other Class Members will be determined in discovery using DFCU's records.

68.   Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in 2020.  While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2020 because DFCU hid its actual practices from its members by describing different practices in agreements and other materials it disseminated to its members.  This not only reasonably delayed discovery, but DFCU's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop DFCU.

### CLASS ACTION ALLEGATIONS

69.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

70.   Plaintiff brings this case, and each of the respective causes of action, as a class action.

71.    The "Class" is composed of:

**The Regulation E Class**:

> All members of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

**The Consumer Fraud Class**:

> All members of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

72.    Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

73.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3).

74.    **Numerosity** – The members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with banks and credit unions with similar practices, that the Class is likely to include thousands of DFCU members.

75.    Upon information and belief, Defendant has databases, and/or other documentation, of its members' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members has been harmed by its practices and thus qualify as a Class Member. Further, the Class

COHEN DOWD QUIGLEY

definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

76.    **Commonality –** This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether Defendant uses the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions.

- Whether the opt-in disclosure agreement Defendant uses to opt-in Class Members violates Regulation E because Defendant's opt-in disclosure agreement does not accurately, clearly, and in an easily understandable way describe Defendant's overdraft services.

- Whether Defendant violated Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Members.

- Whether Defendant's conduct violated the ACFA.

- Whether Defendant continues to violate Regulation E and/or the ACFA by opting in members using its opt-in disclosure agreement, and continuing to assess members overdraft fees on one-time debit card and ATM transactions based on its opt-in disclosure agreement.

77.    **Typicality –** Plaintiff's claims are typical of all Class Members. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure agreement DFCU used to opt-in Plaintiff is the same as the opt-in disclosure agreement DFCU used to opt-in the other Class Members. Plaintiff and the Class Members

COHEN DOWD QUIGLEY

1   have each been assessed overdraft fees on one-time debit card and ATM transactions.

2   Accordingly, Plaintiff will serve the interests of all Class Members.

3       78.   **Adequacy** – Plaintiff will fairly and adequately protect the interests of the

4   Class Members.  Plaintiff has retained competent counsel experienced in class action

5   litigation, and specifically financial institution overdraft class action cases, to ensure such

6   protection.  There are no material conflicts between the claims of the representative Plaintiff

7   and the members of the Class that would make class certification inappropriate.  Plaintiff

8   and counsel intend to prosecute this action vigorously.

9       79.   **Predominance and Superiority** – The matter is properly maintained as a

10  class action because the common questions of law or fact identified herein and to be

11  identified through discovery predominate over questions that may affect only individual

12  Class Members.  Further, the class action is superior to all other available methods for the

13  fair and efficient adjudication of this matter.  Because the injuries suffered by the individual

14  Class Members are relatively small compared to the cost of the litigation, the expense and

15  burden of individual litigation would make it virtually impossible for Plaintiff and Class

16  Members to individually seek redress for Defendant's wrongful conduct.  Even if any

17  individual person or group(s) of Class Members could afford individual litigation, it would

18  be unduly burdensome to the courts in which the individual litigation would proceed.  The

19  class action device is preferable to individual litigation because it provides the benefits of

20  unitary adjudication, economies of scale, and comprehensive adjudication by a single court.

21  In contrast, the prosecution of separate actions by individual Class Members would create a

22  risk of inconsistent or varying adjudications with respect to individual Class Members that

23  would establish incompatible standards of conduct for the party (or parties) opposing the

24  Class and would lead to repetitious trials of the numerous common questions of fact and

25  law.  Plaintiff knows of no difficulty that will be encountered in the management of this

26  litigation that would preclude its maintenance as a class action.  As a result, a class action is

27  superior to other available methods for the fair and efficient adjudication of this controversy.

28  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby

COHEN DOWD QUIGLEY

allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

80.    Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class.  This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

81.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

82.    This matter is properly maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other customers not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to members of the Class and predominate over any questions affecting only individual customers, and a class action is superior to other

COHEN DOWD QUIGLEY

available methods for the fair and efficient adjudication of the controversy, including based on the consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

83.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Federal Rule of Civil Procedure 23(b)(2).  Moreover, on information and belief, Plaintiff alleges that Defendant's use of a non-compliant Regulation E opt-in disclosure agreement and the assessment of improper overdraft fees is substantially likely to continue in the future if an injunction is not entered.

## FIRST CAUSE OF ACTION

### (Violation of Regulation E)

84.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85.    By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq.*, whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq.*, the 'EFTA,'" 12 C.F.R. § 1005.1(b).

86.    Specifically, Defendant's conduct violated Regulation E's "Opt In Rule."  *See* 12 C.F.R. § 1005.17.  The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft*

COHEN DOWD QUIGLEY

1   *service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*"

2   to enter into the overdraft program. *Id.* (emphasis added). The notice "shall be clear and

3   readily understandable." 12 C.F.R. § 1005.4(a)(1). To comply with the affirmative consent

4   requirement, a financial institution must provide a segregated description of its overdraft

5   practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. §

6   1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after

7   receiving the description. The affirmative consent must be provided in a way mandated by

8   12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in

9   a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in"

10   cannot adversely affect any other feature of the account.

11        87.   The intent and purpose of this opt-in disclosure agreement is to "assist

12   customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . .

13   by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable</u>

14   <u>way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 59040,

15   59048, which is "the CFPB's official interpretation of its own regulation," which "warrants

16   deference from the courts unless 'demonstrably irrational,'" and should therefore be treated

17   as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F.

18   Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211

19   (2011) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's

20   Reg Z)).

21        88.   Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which

22   requires affirmative consent before a financial institution may assess overdraft fees against

23   customer accounts through an overdraft program for ATM withdrawals and non-recurring

24   debit card transactions. Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in

25   requirements, including failing to provide its members in a "clear and readily understandable

26   way" a valid description of the overdraft program which meets the strictures of 12 C.F.R.

27   § 1005.17. Defendant has selected an opt-in method that fails to satisfy 12 C.F.R. § 1005.17

28   because, *inter alia*, it states in the non-conforming disclosure agreement that an overdraft

COHEN DOWD QUIGLEY

occurs when there is not enough money in the account to cover a transaction but Defendant pays it anyway. But, in fact, Defendant assesses overdraft fees even when there is enough money in the account to pay for the transaction and Defendant needs to advance no funds at all. This is accomplished by using the internal bookkeeping available balance to assess overdraft fees, rather than the actual and official balance of the account. Defendant failed to use language to describe the overdraft service that identified that it was using the available balance to assess overdraft fees, which meant that in a significant percentage of the transactions that were the subject of the overdraft fee, there was money in the account to cover the transaction and Defendant did not have to advance any money – yet Defendant assessed an overdraft fee anyway.

89.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

90.    As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION

### (Violation of ACFA, A.R.S. §§ 44-1521, *et seq.*)

91.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

92.    The ACFA makes unlawful: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." A.R.S. § 44-1522(A).

COHEN DOWD QUIGLEY

28

93.     A private cause of action exists for an injured consumer against a person who violated the AFCA.  *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 575-76, 521 P.2d 1119, 1121-22 (1974).

94.     As alleged herein, Defendant engaged in deceptive acts and practices in the form of material misrepresentations and misleading statements in its opt-in disclosure agreement by stating that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  A reasonable interpretation of this statement is that it means actual money in the account (actual balance) rather than money in the account that is held for *future* expenses.  However, Defendant did not use the actual account balance to determine overdraft fees as its opt-in disclosure agreement stated.  It used the available balance resulting in overdraft fees paid *even in instances when there is enough money in an account to cover a transaction*, which renders Defendant's statement in its opt-in disclosure agreement materially false and/or misleading.

95.     Defendant knew or should have known that its acts, practices, statements, policies, correspondences, and representations, as discussed above, were false and likely to deceive and/or mislead Plaintiff and the Class Members.

96.     As a direct and proximate result of Defendant's violations of the ACFA, Plaintiff and Class Members have been assessed improper and illegal overdraft fees and those funds removed from their accounts, and Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of ACFA described in this Complaint.

97.     Further, absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting Defendant from misrepresenting and omitting material information concerning its overdraft fee policy at issue in this action in the future and requiring Defendant to immediately stop charging illegal overdraft fees unless and until it re-opts-in current members using a Regulation E complaint opt-in disclosure agreement, Plaintiff and other existing account holders, and the general public, will suffer from and be exposed to Defendant's conduct violative of the ACFA.

98.     Plaintiff requests that she be awarded all other relief as may be available by law, pursuant to the ACFA, including an order of this court compelling Defendant to cease all future business practices related to its overdraft practices in violation of the ACFA as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Putative Class pray for judgment as follows:

    a.    for an order certifying this action as a class action;

    b.    for compensatory damages on all applicable claims and in an amount to be proven at trial;

    c.    for an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

    d.    for statutory damages;

    e.    for civil penalties;

    f.    for an order enjoining the continued wrongful conduct alleged herein;

    g.    for costs;

    h.    for pre-judgment and post-judgment interest as provided by law;

    i.    for attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

    j.    for such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Putative Class demand a trial by jury on all issues so triable.

. . .

. . .

. . .

. . .

. . .

. . .

COHEN DOWD QUIGLEY

30

**RESPECTFULLY SUBMITTED** this 10th day of May, 2021.

/s/ Cindy C. Albracht-Crogan
Cindy C. Albracht-Crogan
Kaysey L. Fung
COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: (602) 252-8400

Richard D. McCune
David C. Wright
**MCCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Emily J. Kirk
**MCCUNE WRIGHT AREVALO, LLP**
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

Attorneys for Plaintiff Eva Cornell
and the Putative Class

31