**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eva Cornell,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Desert Financial Credit Union, et al.,<br><br>　　　　　Defendants. | No. CV-21-00835-PHX-DWL<br><br>**ORDER** |

In this putative class action, Eva Cornell ("Plaintiff") alleges that Desert Financial Credit Union ("Desert Financial") violated certain federal regulations that require clear disclosure of a bank's overdraft practices. (Doc. 1.) In response, Desert Financial has moved to compel arbitration based on an arbitration clause that it added to its standard terms and conditions several years after Plaintiff opened her account. (Doc. 11.) On October 8, 2021, the Court ordered the parties to file supplemental briefing concerning whether the addition of this clause resulted in a valid contract modification. (Doc. 26.)

The Court has now reviewed the parties' supplemental briefing, as well as Desert Financial's motion for an evidentiary hearing. (Docs. 29, 30, 31.) As explained below, the Court concludes that the most prudent course of action is to conduct further fact-finding and then seek certification from the Arizona Supreme Court on the unsettled legal issue that lies at the heart of the parties' dispute.

…

…

**BACKGROUND**

I.    Factual Background[1]

It is undisputed that, when Plaintiff originally opened her account with Desert Financial, there was no arbitration clause in the account agreement. (Doc. 11 at 3; Doc. 12-3; Doc. 14 at 6.) However, when signing the relevant applications, Plaintiff agreed to be bound by Desert Financial's account terms and conditions and agreed that Desert Financial "may change those terms and conditions from time to time." (Doc. 12-1 at 2; Doc. 12-2 at 2.) Plaintiff also elected to receive monthly bank statements from Desert Financial via email. (Doc. 12 ¶ 7; Doc. 12-8; Doc. 12-9.)

It is undisputed that Desert Financial sent Plaintiff's monthly statement for the period ending on March 20, 2021 "to the primary email address it has on file for [Plaintiff]." (Doc. 12 ¶ 6.)[2] However, the parties dispute whether Plaintiff opened and reviewed that statement. In a declaration, Plaintiff avows that although she "use[s] Desert Financial's mobile app to check [her] account balance on [her] mobile device," she "do[es] not review [her] monthly statements through the app or online" and thus did "not see[] the monthly statement that Desert Financial claims contained a notice of an arbitration clause." (Doc. 18-1 ¶¶ 2-3.) Meanwhile, Desert Financial has now submitted a declaration from Tamara Hunter, its manager of account services, avowing that the "Detail User Activity Report" associated with Plaintiff reveals that a person using Plaintiff's account credentials "accessed, viewed, and saved [Plaintiff's] periodic account statements through Desert Financial's online banking platform" and that, during one such session on April 13, 2021, the person accessing Plaintiff's account "display[ed] and save[d] her periodic account statement[] for the period[] ending on . . . March 20, 2021." (Doc. 31-1 ¶¶ 3-4, 6.)

---

[1] Because Desert Financial proffered additional evidence in response to the call for supplemental briefing, the factual background set forth in the October 8, 2021 order has been modified to reflect that new evidence.

[2] Shaun Mitchell, the regional manager of the Desert Financial branch where Plaintiff opened her account, declares under penalty of perjury that Desert Financial "sent copies of the[] periodic statements to the primary email address it has on file for [Plaintiff]." (Doc. 12 at 2.) Although Plaintiff provides her own declaration avowing that she did not *see* the statement, she does not dispute that Desert Financial *sent* it. (Doc. 18 at 1.) As a result, there is no dispute as to whether Desert Financial sent the statement to Plaintiff.

It is undisputed that the account statement for the period ending on March 20, 2021 (which, as noted, Plaintiff may or may not have reviewed) included a graphic inlay that communicated the following:

> NOTICE
> Change-in-Terms
>
> Effective February 10, 2021, Desert Financial updated its Statements of Terms, Conditions, and Disclosures to change how we will resolve legal disputes related to your accounts at Desert Financial.
>
> Please see the Dispute Resolution section of the Statement of Terms, Conditions, and Disclosures on www.desertfinancial.com/disclosures for more information.
>
> Visit DesertFinancial.com/Disclosures

(Doc. 12-6 at 2.) It is also undisputed that the cross-referenced website displayed Desert Financial's updated account agreement, which now includes the following arbitration clause:

> **DISPUTE RESOLUTION; MANDATORY ARBITRATION. READ THIS PROVISION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND THE CREDIT UNION HAVE AGAINST EACH OTHER WILL BE RESOLVED**.
>
> a.  Except as expressly provided herein . . . , you agree that any controversy, dispute, or claim ('Claim') between you and Us that arises out of or relates to [this Agreement], your account, and/or the relationships of the parties hereto shall be resolved or otherwise settled by binding arbitration . . . .
>
> * * *
>
> f.  **THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD THE RIGHT TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE. HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED**

        **THROUGH AN ARBITRATION. . . .**

    \* \* \*

    h.    Arbitration is not a mandatory condition of you maintaining an account with Credit Union.  If you do not want to be subject to this arbitration provision, YOU MAY OPT OUT of this Arbitration Provision . . . .

(Doc. 12 ¶ 5; Doc. 12-4 at 6-7.)  Finally, it is undisputed that Plaintiff never subsequently opted out of the arbitration provision.

II.    <u>Procedural Background</u>

On May 5, 2021, Plaintiff filed the complaint.  (Doc. 1.)

On June 24, 2021, Desert Financial moved to compel arbitration.  (Doc. 11.)  That same day, Desert Financial separately moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 13.)

On July 26, 2021, Plaintiff filed responses to both motions.  (Docs. 18, 19.)

On August 24, 2021, Desert Financial filed replies in support of both motions.  (Docs. 22, 23.)

On October 8, 2021, the Court ordered supplemental briefing with respect to the motion to compel arbitration.  (Doc. 26.)

On October 22, 2021, the parties filed their supplemental briefs.  (Docs. 29, 30.)  That same day, Desert Financial filed a motion for an evidentiary hearing.  (Doc. 31.)

On November 3, 2021, the Court issued a tentative order addressing the parties' supplemental briefing and Desert Financial's request for an evidentiary hearing.  (Doc. 34.)

On November 16, 2021, the Court heard oral argument.

**DISCUSSION**

I.    <u>Arizona's Standard For Modification Of Consumer Contracts</u>

In the October 8, 2021 order, the Court solicited supplemental briefing to "address the key legal issue in this case—whether, under Arizona law, it is enough for a party seeking to modify a contract to send notice of the proposed modification to the offeree

through a communication channel to which the offeree previously consented . . . or whether the offeror must also show that the offeree had actual, subjective knowledge of the proposed modification." (Doc. 26 at 13.) Having now reviewed that briefing, the Court concludes, once again, that "none of the cases cited by the parties provide authoritative guidance on how Arizona courts would resolve this issue." (*Id.* at 9.)

### A. The Parties' Arguments

In her supplemental brief, Plaintiff argues that "Arizona law permits modification of an already-existing contract only when there is something more than just inquiry or constructive notice. In fact, a unilateral attempt to modify a contract requires an affirmative act of assent by both parties to the contract." (Doc. 30 at 1.) The primary case on which Plaintiff relies is *Demasse v. ITT Corp.*, 984 P.2d 1138 (Ariz. 1999), which, according to Plaintiff, holds that "Arizona contract law of generalized application requires affirmative assent" before a contract can be modified. (*Id.* at 2-3.) Plaintiff also argues that three District of Arizona cases—*Vantage Mobility Int'l LLC v. Kersey Mobility LLC*, 2021 WL 1610229 (D. Ariz. 2021), *Rose v. Humana Ins. Co.*, 2018 WL 888982 (D. Ariz. 2018), and *Edwards v. Vemma Nutrition*, 2018 WL 637382 (D. Ariz. 2018)—have "analyzed contract modification and determined that proof of affirmative assent to a contract modification is necessary." (*Id.* at 3-5.) Finally, Plaintiff argues that *Sears Roebuck & Co. v. Avery*, 593 S.E.2d 424 (N.C. App. 2004), a North Carolina case that applied Arizona law, provides further support for her position. (*Id.* at 6.)

Desert Financial, in contrast, argues that "[n]o published, Arizona decision addresses how to modify standardized consumer contracts." (Doc. 29 at 1.) Thus, Desert Financial argues that Arizona courts would "follow the Restatement of the Law" and identifies the tentative draft of § 3 of the Restatement of Law, Consumer Contracts as "address[ing] the precise question posed" in this case and establishing that "a standard contract term in a consumer contract" is modified if "the consumer receives reasonable notice of the proposed modification term." (*Id.* at 2-3.) Desert Financial also points to cases from outside the consumer-contract setting to argue that, under Arizona law,

"subjective knowledge is not required to accept an offer or modify a contract." (*Id.* at 4-5 [citing *Hagin v. Fireman's Fund Ins. Co.*, 353 P.2d 1029 (Ariz. 1960), and *Pinto v. USAA Ins. Agency of Tex.*, 275 F. Supp. 3d 1165 (D. Ariz. 2017)].) Finally, Desert Financial argues that Plaintiff's reliance on *Demasse* is misplaced because *Demasse* "did not involve standardized consumer contracts," but rather implied employment contracts, and "[e]mployment contracts are entirely different than standardized consumer contracts." (*Id.* at 6.) Desert Financial concludes that "[t]he Restatement and virtually every court to address this issue have thus only required 'reasonable notice' to update standardized consumer contracts, not subjective knowledge . . . [and a] contrary rule requiring subjective knowledge to update standard terms would be untenable." (*Id.* at 7.)

B.     **Analysis**

The Court has thoroughly reviewed the cases cited by the parties and concludes that none authoritatively establishes a framework for analyzing assent to the modification of a consumer contract under Arizona law.

Because both sides discuss the Arizona Supreme Court's decision in *Demasse*, and because "[i]n determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court," *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011), the Court will begin there. In *Demasse*, the plaintiff was one of several hourly workers employed by ITT. 984 P.2d at 1141. ITT had issued five editions of an employee handbook that included a seniority layoff provision. *Id.* Although the "earliest version provided simply that layoffs within each job classification would be made in reverse order of seniority," the latest version, published in 1989, added new provisions specifying that "nothing contained herein shall be construed as a guarantee of continued employment" and that "[w]ithin the limits allowed by law, [ITT] reserves the right to amend, modify or cancel this handbook, as well as any or all of the various policies, rules, procedures and programs outlined in it . . . ." *Id.* "When the 1989 handbook was distributed, ITT employees signed an acknowledgment that they had received, understood, and would comply with the revised handbook." *Id.* (quotation marks and citations

omitted).

The dispute arose when ITT terminated Demasse's employment for performance-related reasons, even though he had seniority over co-workers who were not terminated. *Id.* In response, Demasse brought a breach of contract action in federal district court, which granted summary judgment in the employer's favor. *Id.* at 1140. Demasse then appealed, and the Ninth Circuit eventually certified the following question to the Arizona Supreme Court: "Once a policy that an employee will not be laid off ahead of less senior employees becomes part of the employment contract . . . as a result of the employee's legitimate expectations and reliance on the employer's handbook, may the employer thereafter unilaterally change the handbook policy so as to permit the employer to layoff employees without regard to seniority?" *Id.* The Arizona Supreme Court answered that question in the negative, and the relevant portions of the court's analysis are worth quoting in full:

> ITT argues that it had the legal power to unilaterally modify the contract by simply publishing a new handbook. But as with other contracts, an implied-in-fact contract term cannot be modified unilaterally. Once an employment contract is formed—whether the method of formation was unilateral, bilateral, express, or implied—a party may no longer unilaterally modify the terms of that relationship.
>
> The cases dealing with employment contracts are merely part of the general rule that recognizes no difference in legal effect between an express and an implied contract. . . . As a result, to effectively modify a contract, whether implied-in-fact or express, there must be: (1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration.
>
> The 1989 handbook, published with terms that purportedly modified or permitted modification of pre-existing contractual provisions, was therefore no more than an offer to modify the existing contract. Even if the 1989 handbook constituted a valid offer, questions remain whether the Demasse employees accepted that offer and whether there was consideration for the changes ITT sought to effect.
>
> * * *
>
> Continued employment after issuance of a new handbook does not constitute acceptance, otherwise the illusion (and the irony) is apparent: to preserve

- 7 -

their right under the [existing contract] . . . plaintiffs would be forced to quit. It is too much to require an employee to preserve his or her rights under the original employment contract by quitting working. Thus, the employee does not manifest consent to an offer modifying an existing contract without taking affirmative steps, beyond continued performance, to accept.

There is no doubt that the parties to a contract may by their mutual agreement accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract, but one party to a contract cannot by his own acts release or alter its obligations. The intention must be mutual. If passive silence constituted acceptance, the employee could not remain silent and continue to work. Instead [he] would have to give specific notice of rejection to the employer to avoid having his actions construed as acceptance. Requiring an offeree to take affirmative steps to reject an offer . . . is inconsistent with general contract law. The burden is on the employer to show that the employee assented with knowledge of the attempted modification and understanding of its impact on the underlying contract.

To manifest consent, the employee must first have legally adequate notice of the modification. . . . Legally adequate notice is more than the employee's awareness of or receipt of the newest handbook. An employee must be informed of any new term, aware of its impact on the pre-existing contract, and affirmatively consent to it to accept the offered modification.

When ITT distributed the 1989 handbook containing the provisions permitting unilateral modification or cancellation, it did not bargain with those pre-1989 employees who had seniority rights under the old handbooks, did not ask for or obtain their assent, and did not provide consideration other than continued employment. The employees signed a receipt for the 1989 handbook stating that they had received the handbook, understood that it was their responsibility to read it, comply with its contents, and contact Personnel if they had any questions concerning the contents. The Demasse employees were not informed that continued employment—showing up for work the next day—would manifest assent, constitute consideration, and permit cancellation of any employment rights to which they were contractually entitled.

\* \* \*

In the briefs and at oral argument, as well in the dissents, there was a note of concern that holding that an employer could not cancel existing contractual terms by issuing a new handbook would be a radical departure from Arizona law. We blaze no new ground in this opinion. It has always been Arizona

- 8 -

>law that a contract, once made, must be performed according to its terms and that any modification of those terms must be made by mutual assent and for consideration. To those who believe our conclusion will destroy an employer's ability to update and modernize its handbook, we can only reply that the great majority of handbook terms are certainly non-contractual and can be revised, that the existence of contractual terms can be disclaimed in the handbook in effect at the time of hiring and, if not, permission to modify can always be obtained by mutual agreement and for consideration. In all other instances, the contract rule is and has always been that one should keep one's promises.

*Id.* at 1144-1148.

At first blush, *Demasse* seems to provide support for Plaintiff's position in this case. *Demasse* requires "affirmative steps" to accept an offer to modify an existing contract and places the burden on the offeror to show that the offeree "assented with knowledge of the attempted modification and understanding of its impact on the underlying contract." *Id.* at 1145. *Demasse* also states that legally adequate notice is "more than the employee's awareness of or receipt of the newest handbook. An employee must be informed of any new term, aware of its impact on the pre-existing contract, and affirmatively consent to it to accept the offered modification." *Id.* at 1146. These statements are difficult to reconcile with Desert Financial's position in this case, which is that a valid contract modification can occur simply by emailing notice of the proposed modification to a contractual counterparty, irrespective of whether the counterparty even opens and reads the email or takes affirmative steps to accept the proposed modification. Additionally, although Desert Financial suggests that *Demasse* is an employment-specific case that has no applicability in the context of consumer contracts, several of *Demasse*'s passages can be read as suggesting that the opinion was not intended to be limited to the employment context, but rather was grounded in generally applicable principles of contract law. For example, the court noted that, "as with other contracts, an implied-in-fact contract term cannot be modified unilaterally" and that "[t]he cases dealing with employment contracts are merely part of the general rule that recognizes no difference in legal effect between an express and an implied contract." *Id.* at 1144-45. The court also stated that "[r]equiring an offeree to take

1 affirmative steps to reject an offer . . . is inconsistent with general contract law." *Id.*
2 at 1146. Finally, the court observed that "the great majority of handbook terms are
3 certainly non-contractual and can be revised . . . . In all other instances, the contract rule is
4 and has always been that one should keep one's promises." *Id.* at 1148. Given these
5 statements, there is a fair argument that *Demasse* should be read as articulating a general
6 rule of contract modification that the Arizona Supreme Court then happened to apply to a
7 dispute arising in the employment context.

8 On the other hand, although *Demasse* does not explicitly cabin itself to employment
9 contracts (and, as noted, contains various passages that suggest it should not be so cabined),
10 it also does not explicitly state that its holding should extend *beyond* employment.
11 Additionally, some aspects of the court's analysis seem to be rooted in employment-
12 specific considerations. For example, the court concluded that "affirmative steps" should
13 be required to accept a modification offer because "otherwise . . . plaintiffs would be forced
14 to quit" and "[i]t is too much to require an employee to preserve his or her rights under the
15 original employment contract by quitting working." 984 P.2d at 1145 (citation and internal
16 quotation marks omitted). But such considerations are arguably not present in the context
17 of consumer contracts, such as Plaintiff's contract with Desert Financial to open and
18 maintain a bank account.

19 This is only one of several reasons to suspect the Arizona Supreme Court might
20 apply a stringent modification requirement in the context of employment contracts while
21 allowing consumer contracts to be modified more easily. The Arizona Supreme Court has
22 elsewhere deemed standardized contracts "essential to a system of mass production and
23 distribution" and endorsed the notion that "those who make use of a standardized form of
24 agreement neither expect nor desire their customers to understand or even to read the
25 standard terms. On the other hand, customers trust to the good faith of the party using the
26 form [and] . . . understand that they are assenting to the terms not read or not understood,
27 subject to such limitations as the law may impose." *Darner Motor Sales v. Universal*
28 *Underwriters Ins. Co.*, 682 P.2d 388, 391 (Ariz. 1984). And whatever concerns prompted

the Arizona Supreme Court to endorse the standardization and rapid execution of contracts in 1984 may be even more pertinent today. For example, in 1984, almost no Arizonans were online—today, nearly all of them are.

In a related vein, and as discussed in the order soliciting supplemental briefing, it appears that "California has a well-developed body of law concerning electronic consumer agreements" under which "courts apply the theories of 'constructive notice' and 'inquiry notice,' which may result in a finding of acceptance even when a consumer does not have actual notice of a contract's terms." (Doc. 26 at 9.) Although Arizona is, of course, free to adopt rules and legal doctrines that differ from those followed in neighboring states, it is not obvious that Arizona has made an intentional choice to deviate from California's approach in this area and adopt a rule that makes it more difficult to modify consumer agreements.

Desert Financial's invocation of the tentative draft of the Restatement of the Law, Consumer Contracts provides another reason to question whether the Arizona Supreme Court would apply *Demasse*'s stringent modification rule in the context of consumer contracts. Section 3(a) of that portion of the Restatement provides as follows:

> (a) A standard contract term in a consumer contract governing an ongoing relationship is modified if:
> 
> (1) the consumer receives a reasonable notice of the proposed modified term and a reasonable opportunity to review it;
> 
> (2) the consumer receives a reasonable opportunity to reject the proposed modified term and continue the contractual relationship under the existing term, and a reasonable notice of this opportunity; and
> 
> (3) the consumer either (A) manifests assent to the modified term or (B) does not reject the proposed modified term and continues the contractual relationship after the expiration of the rejection period provided in the proposal.

Restatement of the Law, Consumer Contracts § 3 (Am. Law. Inst. Tentative Draft 2019). As Desert Financial notes in its supplemental brief, there is a strong argument that the proposed modification effort in this case would be considered valid under § 3(a). *See also*

*id.* cmt. 2, illus. 1 ("A consumer opens a checking account with a bank and signs a user agreement. The bank seeks to change the terms of the agreement occasionally and sends notices to the consumer in advance of each such change. Each change of terms is a proposed modification under this Section . . . ."). The potential conflict between *Demasse*, which sets forth a relatively stringent modification requirement, and § 3(a) of the Restatement, which calls for a less onerous requirement, presents a dilemma because, "[a]bsent controlling authority to the contrary," Arizona courts "generally follow the Restatement when it sets forth sound legal policy." *In re Sky Harbor Hotel Props., LLC*, 443 P.3d 21, 23 (Ariz. 2019). *See also In re Krohn*, 52 P.3d 774, 779 (Ariz. 2002) ("We have long followed the rule that where not bound by our previous decisions or by legislative enactment, we would follow the Restatement of the Law.") (cleaned up).[3]

The parties' supplemental briefs also contain citations to an array of decisions by federal district courts and other courts applying Arizona law. As an initial matter, because those decisions simply represent attempts to discern the law the Arizona Supreme Court would deem applicable in this circumstance (an exercise the Court is repeating here), they are not dispositive. Additionally, many of the parties' cited cases are inapposite.[4] Finally, and most important, although the parties have been able to identify certain authorities that tend to support their respective positions,[5] the overall takeaway is that other courts have

---

[3] Although the provision cited by Desert Financial appears in a tentative draft of the Restatement, Arizona's general policy of following the Restatement seems to apply to tentative provisions, too. *See, e.g.*, *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977) ("We hold the standard adopted in the Tentative Draft of the American Law Institute, Restatement (Second) of Torts . . . is the standard to be followed in this State.").

[4] The inapposite cases include *Vantage Mobility*, *Edwards*, and *Hagin*. *Vantage Mobility* stands for the uncontested proposition that "a contract cannot be unilaterally modified nor can one party to a contract alter its terms without the assent of the other party," but it does not discuss assent with the level of specificity that this case demands. 2021 WL 1610229 at *13-14. *Edwards* analyzes whether an arbitration agreement was agreed to, but it is factually inapposite because the original contract was never modified. 2018 WL 637382. *Hagin* is a 1960 Arizona Supreme Court case that applies a theory of inquiry notice to insurance policies, 353 P.2d 1029, but if the 1999 *Demasse* opinion establishes universal principles of contractual modification, it would overrule anything to the contrary in *Hagin*.

[5] For example, in *Taleb v. AutoNation USA Corp.*, 2006 WL 3716922 (D. Ariz. 2006), the court held that "[t]he holding of the Arizona Supreme Court in *DeMasse* is limited to situations in which an employer attempts to unilaterally modify a contract that creates an

reached conflicting and difficult-to-reconcile conclusions about the current state of Arizona's law of contract modification. In the Court's view, this lack of unanimity is further evidence that the legal issue presented in this case is unsettled and would benefit from clarification.

To that end, Desert Financial now argues that "[i]f this Court believes that the Arizona Supreme Court would not follow the Restatement, it should certify this question to the Supreme Court." (Doc. 29 at 4 n.1.)[6] The Court agrees. In *Sears Roebuck*, the North Carolina Court of Appeals was asked to decide the enforceability of an agreement to arbitrate under Arizona law. 593 S.E.2d at 424. It correctly observed that "Arizona's appellate courts have not squarely addressed the issue presented by this appeal" and was forced to rely on *Demasse* and fill in the cracks with California caselaw. *Id.* at 431. Over 15 years have passed since that decision, yet the legal landscape is no clearer today. Rather than continue to guess at the Arizona Supreme Court's perspective, the Court is inclined to simply certify a question to that court (after engaging in further fact-finding as discussed

---

expectation of job security." *Id.* at *5. In contrast, in *Rose*, the court did not seem to view *Demasse* as being limited in this fashion. There, the issue was whether an insurance company had validly modified its "Producer Agreement" with one of its brokers by emailing a notice to the broker, 11 years after the agreement was originally signed, announcing the addition of an arbitration clause. 2018 WL 888982 at *1. Citing *Demasse*, the court concluded that the insurance company's modification attempt was unsuccessful because "even if . . . Humana's evidence of sending the email is accepted as true, it shows only that an email was sent to Plaintiff and not rejected by her server. It does not show that Plaintiff read the email or the allegedly attached amendments, and it does not show that she understood the email and assented to the arbitration agreement it contained." *Id.* at *3. Unlike in *Taleb*, there was no discussion of whether the broker's contract with the insurance company created an expectation of job security and whether the presence of such an expectation had any bearing on the contract-modification analysis.

[6] During oral argument, Desert Financial clarified that it doesn't believe certification is ultimately necessary because "there is no Arizona law specifically on this issue of how to modify a standardized consumer contract" and "if there's unsettled law Arizona courts follow the Restatement." The difficulty with this argument is that Arizona courts don't automatically follow the Restatement whenever the law is unsettled—rather, Arizona courts may follow the Restatement when there is no "controlling authority to the contrary." *In re Sky Harbor Hotel Props.*, 443 P.3d at 23. Thus, when an Arizona court is faced with the task of determining whether it is bound by a prior precedent, and there are unsettled questions about the scope of the prior precedent, the court is not free to disregard the potentially binding precedent (without resolving the unsettled questions about its scope) and uncritically follow the Restatement. *See, e.g., Powers v. Taser Int'l, Inc.*, 174 P.3d 777, 782 (Ariz. Ct. App. 2007) ("[W]e do not follow the Restatement blindly and will come to a contrary conclusion if Arizona law suggests otherwise.") (citations omitted).

- 13 -

in Part II below).

"Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and hel[p] build a cooperative judicial federalism." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 77 (1997) (citations and internal quotation marks omitted). *See also Harris v. Arizona Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1068 (D. Ariz. 2014) ("A basic prerequisite for a court to certify a question to the Arizona Supreme Court is the existence of a pending issue of Arizona law not addressed by relevant Arizona authorities."). The Arizona Supreme Court may accept a request for certification only if the question to be resolved "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the intermediate appellate courts of this state." A.R.S. § 12-1861.

These requirements are satisfied here. As described above, this case presents a "novel or unsettled question[] of state law" as to which "there is no controlling precedent" from the Arizona appellate courts. *Arizonans for Off. Eng.*, 520 U.S. at 77; A.R.S. § 12-1861. Additionally, the disputed issue "may be determinative of the cause then pending in the certifying court." A.R.S. § 12-1861. If, as Desert Financial contends, Plaintiff's claims in this action are subject to arbitration, there will be no occasion for the Court to address the merits of her claims.

Certification seems particularly appropriate here because it will promote values of comity and federalism. This case presents a pure issue of contract law that is likely to recur. "Contract law is," at its essence, "a set of policy judgments concerning how to decide the meaning of private agreements, which private agreements should be legally enforceable, and what remedy to afford for their breach." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 247-48 (1995) (O'Connor, J., concurring and dissenting in part). It promotes judicial federalism to allow state courts to "decide [whether] to force parties to comply with a contract," given that they are most qualified to determine whether "state policy, as

expressed in its contract law, will be advanced by that decision." *Id. See also Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1005 (11th Cir. 2013) (certifying question to the Oklahoma Supreme Court concerning whether an arbitration agreement was incorporated by reference into a consumer contract and explaining that "[i]t is particularly appropriate for the state court to define the law here because of the possibility that it will be influenced by state policy concerns relating to consumer contracts").

II. <u>Motion For An Evidentiary Hearing</u>

Desert Financial has filed a motion for a "two-hour evidentiary hearing pursuant to 9 U.S.C. § 4." (Doc. 31.) Under 9 U.S.C § 4, if there is a factual dispute regarding "the making of the arbitration agreement . . . the court shall proceed summarily to the trial thereof." Plaintiff, in her response to Desert Financial's motion to compel arbitration, accepts the premise that "[i]f, after review of the parties' arguments, there is a factual question regarding the formation of the agreement to arbitrate, the Court must deny the motion and resolve the dispute through an evidentiary hearing or mini-trial." (Doc. 18 at 4.)

Desert Financial has established the presence of a factual question regarding the formation of the agreement to arbitrate. Specifically, although Plaintiff avows that she does "not review [her] monthly statements through the app or online" and thus did "not see[] the monthly statement that Desert Financial claims contained a notice of an arbitration clause" (Doc. 18-1 ¶ 2), Desert Financial has proffered evidence that Plaintiff "accessed, displayed, and saved the March 2021 statement (and other statements) less than a month before filing this lawsuit." (Doc. 31 at 4, citing Doc. 31-1 ¶¶ 3-4, 6.) Because Plaintiff's subjective notice or knowledge of the March 2021 account statement may be relevant to whether a valid contract modification occurred, further proceedings to resolve the parties' factual dispute on that issue are warranted.[7]

---

[7] To be clear, the presence or absence of subjective awareness of the modification proposal may ultimately prove irrelevant. Under *Demasse*, "awareness of or receipt of" the proposed modification is alone insufficient—instead, the offeree must also "affirmatively consent to . . . the offered modification." 984 P.2d at 1146. Nevertheless, it is possible the Arizona Supreme Court will conclude that, even if affirmative consent isn't required to modify a consumer contract, subjective awareness of the modification

The Court will serve as the fact-finder during these proceedings. "If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue [*i.e.*, whether an arbitration agreement was made]." 9 U.S.C. § 4. Generally, "the party alleged to be in default may . . . on or before the return day of the application, demand a jury trial of such issue . . . ." *Id.* "Courts confronted with the issue have generally determined that 'the return day of the application,' by which a plaintiff must file a demand for jury trial, is the date on which the plaintiff's opposition to a petition to compel arbitration is due." *Clifford v. Trump*, 2018 WL 5263189, *2 (C.D. Cal. 2018). Because Plaintiff did not demand a jury trial in her response to Desert Financial's motion to compel arbitration,[8] the Court will make findings of fact as to (1) whether Plaintiff viewed, accessed, displayed, or saved the March 2021 statement, and (2) whether Plaintiff visited DesertFinancial.com/Disclosures, or otherwise viewed, accessed, displayed, or saved Desert Financial's updated account agreement containing an arbitration clause.

Finally, during oral argument, both sides seemed to agree that they should be allowed to engage in limited, expedited discovery before the ultimate resolution of these factual disputes. Additionally, the parties discussed the possibility of engaging in "Rule

---

offer (as opposed to inquiry or constructive notice) is required. Thus, resolving the subjective-versus-constructive notice issue, in advance of the issuance of the certification order, will maximize the chances that the Arizona Supreme Court's answer will be dispositive of the arbitrability issue in this case.

[8] Although Plaintiff made a general jury demand in the caption of her complaint (Doc. 1 at 1), she did not contend during oral argument that this demand entitles her to a jury trial on the formation of the agreement to arbitrate. At any rate, although the Court has not found Ninth Circuit authority on this issue, *see Mayorga v. Ronaldo*, 2020 WL 5821953, *10 (D. Nev. 2020) ("The Ninth Circuit has not yet determined whether a general demand for a jury trial satisfies the FAA's procedure . . . ."), district courts within the Ninth Circuit and appellate courts outside the Ninth Circuit have concluded that "to preserve [the] statutory right to a jury trial on the making of his arbitration agreement . . . a party must make a *specific* demand for a jury trial on a *specific* issue." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1349 (11th Cir. 2017). Thus, a plaintiff's "jury demand [that] came in the form of a general demand in [her] complaint" will not satisfy the requirement of a "demand [for] a jury trial on a specific issue related to the making of the arbitration agreement." *Id. See also Mayorga*, 491 F. Supp. 3d at 857 (adopting the Eleventh Circuit's reasoning); *Alvarez v. T-Mobile USA, Inc.*, 2011 WL 6702424, *9-10 (E.D. Cal. 2011) ("Since Alvarez did not demand a jury trial on or before the return day for T-Mobile's motion to compel arbitration, he no longer has the right to demand a jury trial on the issue of whether he entered into an agreement to arbitrate with T-Mobile when he activated his phone service. This court must therefore hold a non-jury evidentiary hearing on the limited issue of whether T-Mobile and Alvarez formed an agreement to arbitrate.") (citations omitted).

56 style briefing" in lieu of (or, perhaps, in advance of) an evidentiary hearing. As discussed at the conclusion of oral argument, the Court will order the parties to meet and confer about these issues and then file a joint notice setting forth their respective positions. After reviewing the joint notice, the Court will provide further guidance.

Accordingly,

**IT IS ORDERED** that:

(1) Desert Financial's motion for an evidentiary hearing (Doc. 31) is **granted in part**.

(2) The parties shall, by December 1, 2021, file a joint notice setting forth their respective positions (with citations to legal authorities, if necessary) on the following issues: (a) whether they should be allowed to engage in limited, expedited discovery; (b) if so, which specific discovery steps should be authorized (along with proposed deadlines); (c) following the conclusion of the discovery process, whether the Court should proceed directly to an evidentiary hearing or allow the parties to submit summary judgment-style briefing; and (d) a proposed date (or dates) for the evidentiary hearing and/or briefing schedule.

Dated this 17th day of November, 2021.

Dominic W. Lanza
United States District Judge