**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eva Cornell, | No. CV-21-00835-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Desert Financial Credit Union, et al., | |
| Defendants. | |

In this putative class action, Eva Cornell ("Plaintiff") alleges that Desert Financial Credit Union ("Desert Financial") violated certain federal regulations that require clear disclosure of a bank's overdraft practices. (Doc. 1.) Desert Financial has, in turn, moved to compel arbitration based on an arbitration clause that it added to its standard terms several years after Plaintiff opened her account. (Doc. 11.) After soliciting supplemental briefing on whether adding this clause resulted in a valid contract modification under Arizona law (Doc. 26), the Court concluded that "that the most prudent course of action is to conduct further fact-finding and then seek certification from the Arizona Supreme Court on the unsettled legal issue that lies at the heart of the parties' dispute." (Doc. 38.)

To that end, the Court held an evidentiary hearing on March 8, 2022. (Doc. 44.) The evidence presented during the hearing establishes that Plaintiff received, downloaded, and viewed a statement from Desert Financial in April 2021 that contained a notice of the change. This notice also identified the website Plaintiff could visit to obtain more information about the change. However, Plaintiff did not visit the website and remained

subjectively unaware that an arbitration provision had been added.

With the factual record now fully developed, the Court respectfully certifies two questions of law to the Arizona Supreme Court.

**BACKGROUND**

I.  Factual Background

The facts set forth below are based on the evidence submitted during the evidentiary hearing and other materials in the record. Any factual disputes were resolved by the Court in its capacity as the finder of fact. (Doc. 38 at 15-16.)

In October 2018, Plaintiff applied to Desert Financial to open a "Membership Savings" account and a "Desert Connect Checking" account. (Exhibits 6, 7.)[1] In each application, Plaintiff "agree[d] to the terms and conditions of any account that I/we have applied for, and agree[d] that the credit union may change those terms and conditions from time to time." (*Id.*) During the application process, Plaintiff also consented to the electronic delivery of all future communications from Desert Financial, including all disclosures, notices, and account statements. (Exhibits 9, 10.)

When Plaintiff opened her accounts, Desert Financial's Statements of Terms, Conditions, and Disclosures ("Terms") did not include an arbitration clause. (Exhibit 8.)

Plaintiff was unaware of the presence or absence of an arbitration clause when she opened the accounts. Plaintiff also testified during her deposition that she would have opened the accounts even if she had known that disputes would be subject to arbitration.

In February 2021, Desert Financial updated its Terms to add an arbitration clause. (Exhibit 5.) The clause was added in Section 28, which appears on page five of a fourteen-page document. (*Id.*) The new clause began as follows: '**DISPUTE RESOLUTION; MANDATORY ARBITRATION. READ THIS PROVISION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND THE CREDIT UNION HAVE AGAINST EACH OTHER WILL BE RESOLVED**." The bolded, partially underlined, all-caps format of this clause made it stand out from other

---

[1] "Exhibits" refers to exhibits admitted during the evidentiary hearing.

1  portions of the document. (*Id.*)  The new clause went on to explain that "[a]rbitration is
2  not a mandatory condition of you maintaining an account with Credit Union.  If you do not
3  want to be subject to this arbitration provision, YOU MAY OPT OUT of this arbitration
4  provision so long as the Credit Union receives notice of your desire to opt-out by April 30,
5  2021 or 30 days after you open your account, whichever is later." (*Id.*)  The clause also
6  provided details on how to complete the opt-out process.  (*Id.*)

7      Desert Financial did not send the new version of its Terms to Plaintiff (or to its other
8  375,000 customers).  Instead, Desert Financial inserted the following orange-and-blue
9  banner on the first page of its next cycle of monthly account statements:



16  (Exhibit 1.)  As noted, this banner informed customers that Desert Financial had "change[d]
17  how we will resolve legal disputes related to your accounts at Desert Financial," provided
18  a URL that customers could use to view the latest version of the Terms, and explained that
19  the changes appeared in the "Dispute Resolution section" of the Terms.

20      This banner appeared in Plaintiff's account statement for the period of February 21,
21  2021 through March 20, 2021 ("the March 2021 statement").  Because Plaintiff had chosen
22  to receive electronic delivery of communications from Desert Financial, she did not receive
23  a hard copy of the March 2021 statement in the mail.  Instead, she received an email from
24  Desert Financial on March 23, 2021 notifying her that her most recent monthly statement
25  was available.  (Exhibit 2.)

26      During the early stages of this case, Plaintiff submitted a declaration avowing that
27  she had never "seen" the March 2021 statement.  (Doc. 18-1 ¶ 3.  *See also* Exhibit 22.)
28  During the evidentiary hearing, Desert Financial proved otherwise.

The relevant events occurred on April 13, 2021 and were precipitated by Plaintiff's efforts to buy a car from a car dealership. As part of the financing process, the dealership asked Plaintiff to provide her three most recent bank statements. In response, Plaintiff attempted to download the statements via Desert Financial's mobile banking application. During the downloading process, Plaintiff not only viewed HTML versions of her monthly statements for January 2021, February 2021, and March 2021 via the app but also opened and saved a .pdf version of each monthly statement. (Exhibit 2.) This distinction is important because, although the HTML version of the March 2021 statement did not contain the orange-and-blue banner notifying customers about the change to the Terms, the .pdf version of the March 2021 statement did.[2] Thus, Plaintiff saw (however briefly) the notice regarding the change in Terms, which appeared in the March 2021 statement, during the mobile app download process.

Although Plaintiff successfully downloaded the three monthly statements onto her phone via the mobile app, she couldn't locate them on her phone afterward. As a result, she decided to call Desert Financial to request copies of the monthly statements. After some discussion, Desert Financial's customer service representative caused the three monthly statements to be transmitted to Plaintiff via a third-party service called DocuSign. Plaintiff, in turn, forwarded one of the DocuSign emails to the car dealership and provided a password so the dealership could download the statements.

During the evidentiary hearing, the parties presented an array of technical evidence concerning the DocuSign transmission and downloading process. From that evidence, it is clear that Plaintiff saw (however briefly) a copy of the March 2021 statement containing the blue-and-orange notice at some point before she forwarded the DocuSign materials to the dealership. This means that Plaintiff twice saw the blue-and-orange notice on April 13, 2021—once when downloading the March 2021 statement via the mobile app, and again

---

[2] At the start of each month, Desert Financial would change the banner appearing on the front page of monthly statements being viewed in HTML format via the mobile banking app to reflect Desert Financial's most recent advertisement. Thus, by the time Plaintiff viewed her March 2021 statement on April 13, 2021, the orange-and-blue notice had been replaced with a new banner advertisement.

- 4 -

1  when obtaining a copy of the March 2021 statement from Desert Financial via DocuSign.

2  There is no evidence that Plaintiff ever visited the URL identified in the blue-and-orange banner notice to review the updated version of the Terms.  Plaintiff testified that she was then, and remains now, unfamiliar with the concept of legal arbitration (and legal terms in general).  Given that Plaintiff did not visit the website that contained the updated Terms, and that Plaintiff had little familiarity with how "legal disputes" are "resolve[d]" when she saw the notice, the Court finds that Plaintiff was subjectively unaware that Desert Financial had modified the Terms in February 2021 to add an arbitration provision.

It is undisputed that Plaintiff never opted out of the arbitration provision pursuant to the opt-out process described in the Terms.

II.     Relevant Procedural Background

On May 5, 2021, Plaintiff filed the complaint.  (Doc. 1.)

On June 24, 2021, Desert Financial moved to compel arbitration.  (Doc. 11.)

On July 26, 2021, Plaintiff filed a response.  (Doc. 18.)

On August 24, 2021, Desert Financial filed a reply.  (Doc. 22.)

On October 8, 2021, the Court ordered supplemental briefing.  (Doc. 26.)

On October 22, 2021, the parties filed their supplemental briefs.  (Docs. 29, 30.)  Desert Financial included, in its supplemental brief, a request for certification to the Arizona Supreme Court.  (Doc. 29 at 4 n.1.)  That same day, Desert Financial filed a motion for an evidentiary hearing.  (Doc. 31.)

On November 16, 2021, the Court heard oral argument.  (Doc. 37.)

On November 17, 2021, the Court issued an order granting Desert Financial's request for an evidentiary hearing and suggesting that certification to the Arizona Supreme Court would be appropriate following the evidentiary hearing.  (Doc. 38.)

On March 8, 2022, the evidentiary hearing took place.  (Doc. 44.)

…

…

…

**DISCUSSION**

I.  Arizona's Standard For Modification Of Consumer Contracts

In an October 8, 2021 order, the Court solicited supplemental briefing to "address the key legal issue in this case—whether, under Arizona law, it is enough for a party seeking to modify a contract to send notice of the proposed modification to the offeree through a communication channel to which the offeree previously consented . . . or whether the offeror must also show that the offeree had actual, subjective knowledge of the proposed modification." (Doc. 26 at 13.) Having now reviewed that briefing, the Court concludes, once again, that "none of the cases cited by the parties provide authoritative guidance on how Arizona courts would resolve this issue." (*Id.* at 9.)

A.  **The Parties' Arguments**

In her supplemental brief, Plaintiff argues that "Arizona law permits modification of an already-existing contract only when there is something more than just inquiry or constructive notice. In fact, a unilateral attempt to modify a contract requires an affirmative act of assent by both parties to the contract." (Doc. 30 at 1.) The primary case on which Plaintiff relies is *Demasse v. ITT Corp.*, 984 P.2d 1138 (Ariz. 1999), which, according to Plaintiff, holds that "Arizona contract law of generalized application requires affirmative assent" before a contract can be modified. (*Id.* at 2-3.) Plaintiff also argues that three District of Arizona cases—*Vantage Mobility Int'l LLC v. Kersey Mobility LLC*, 2021 WL 1610229 (D. Ariz. 2021), *Rose v. Humana Ins. Co.*, 2018 WL 888982 (D. Ariz. 2018), and *Edwards v. Vemma Nutrition*, 2018 WL 637382 (D. Ariz. 2018)—have "analyzed contract modification and determined that proof of affirmative assent to a contract modification is necessary." (*Id.* at 3-5.) Finally, Plaintiff argues that *Sears Roebuck & Co. v. Avery*, 593 S.E.2d 424 (N.C. App. 2004), a North Carolina case that applied Arizona law, provides further support for her position. (*Id.* at 6.)

Desert Financial, in contrast, argues that "[n]o published, Arizona decision addresses how to modify standardized consumer contracts." (Doc. 29 at 1.) Thus, Desert Financial argues that Arizona courts would "follow the Restatement of the Law" and

identifies the tentative draft of § 3 of the Restatement of Law, Consumer Contracts as "address[ing] the precise question posed" in this case and establishing that "a standard contract term in a consumer contract" is modified if "the consumer receives reasonable notice of the proposed modification term." (*Id.* at 2-3.) Desert Financial also points to cases from outside the consumer-contract setting to argue that, under Arizona law, "subjective knowledge is not required to accept an offer or modify a contract." (*Id.* at 4-5 [citing *Hagin v. Fireman's Fund Ins. Co.*, 353 P.2d 1029 (Ariz. 1960), and *Pinto v. USAA Ins. Agency of Tex.*, 275 F. Supp. 3d 1165 (D. Ariz. 2017)].) Finally, Desert Financial argues that Plaintiff's reliance on *Demasse* is misplaced because *Demasse* "did not involve standardized consumer contracts," but rather implied employment contracts, and "[e]mployment contracts are entirely different than standardized consumer contracts." (*Id.* at 6.) Desert Financial concludes that "[t]he Restatement and virtually every court to address this issue have thus only required 'reasonable notice' to update standardized consumer contracts, not subjective knowledge . . . [and a] contrary rule requiring subjective knowledge to update standard terms would be untenable." (*Id.* at 7.)

B. **Analysis**

The Court has thoroughly reviewed the cases cited by the parties and concludes that none authoritatively establishes a framework for analyzing assent to the modification of a consumer contract under Arizona law.

Because both sides discuss the Arizona Supreme Court's decision in *Demasse*, and because "[i]n determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court," *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011), the Court will begin there. In *Demasse*, the plaintiff was one of several hourly workers employed by ITT. 984 P.2d at 1141. ITT had issued five editions of an employee handbook that included a seniority layoff provision. *Id.* Although the "earliest version provided simply that layoffs within each job classification would be made in reverse order of seniority," the latest version, published in 1989, added new provisions specifying that "nothing contained herein shall be construed as a guarantee of

continued employment" and that "[w]ithin the limits allowed by law, [ITT] reserves the right to amend, modify or cancel this handbook, as well as any or all of the various policies, rules, procedures and programs outlined in it . . . ." *Id.* "When the 1989 handbook was distributed, ITT employees signed an acknowledgment that they had received, understood, and would comply with the revised handbook." *Id.* (cleaned up).

The dispute arose when ITT terminated Demasse's employment for performance-related reasons, even though he had seniority over co-workers who were not terminated. *Id.* In response, Demasse brought a breach of contract action in federal district court, which granted summary judgment in the employer's favor. *Id.* at 1140. Demasse then appealed, and the Ninth Circuit eventually certified the following question to the Arizona Supreme Court: "Once a policy that an employee will not be laid off ahead of less senior employees becomes part of the employment contract . . . as a result of the employee's legitimate expectations and reliance on the employer's handbook, may the employer thereafter unilaterally change the handbook policy so as to permit the employer to layoff employees without regard to seniority?" *Id.* The Arizona Supreme Court answered that question in the negative, and the relevant portions of the court's analysis are worth quoting in full:

> ITT argues that it had the legal power to unilaterally modify the contract by simply publishing a new handbook. But as with other contracts, an implied-in-fact contract term cannot be modified unilaterally. Once an employment contract is formed—whether the method of formation was unilateral, bilateral, express, or implied—a party may no longer unilaterally modify the terms of that relationship.
>
> The cases dealing with employment contracts are merely part of the general rule that recognizes no difference in legal effect between an express and an implied contract. . . . As a result, to effectively modify a contract, whether implied-in-fact or express, there must be: (1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration.
>
> The 1989 handbook, published with terms that purportedly modified or permitted modification of pre-existing contractual provisions, was therefore no more than an offer to modify the existing contract. Even if the 1989 handbook constituted a valid offer, questions remain whether the Demasse employees accepted that offer and whether there was consideration for the

- 8 -

changes ITT sought to effect.

* * *

Continued employment after issuance of a new handbook does not constitute acceptance, otherwise the illusion (and the irony) is apparent: to preserve their right under the [existing contract] . . . plaintiffs would be forced to quit. It is too much to require an employee to preserve his or her rights under the original employment contract by quitting working. Thus, the employee does not manifest consent to an offer modifying an existing contract without taking affirmative steps, beyond continued performance, to accept.

There is no doubt that the parties to a contract may by their mutual agreement accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract, but one party to a contract cannot by his own acts release or alter its obligations. The intention must be mutual. If passive silence constituted acceptance, the employee could not remain silent and continue to work. Instead [he] would have to give specific notice of rejection to the employer to avoid having his actions construed as acceptance. Requiring an offeree to take affirmative steps to reject an offer . . . is inconsistent with general contract law. The burden is on the employer to show that the employee assented with knowledge of the attempted modification and understanding of its impact on the underlying contract.

To manifest consent, the employee must first have legally adequate notice of the modification. . . . Legally adequate notice is more than the employee's awareness of or receipt of the newest handbook. An employee must be informed of any new term, aware of its impact on the pre-existing contract, and affirmatively consent to it to accept the offered modification.

When ITT distributed the 1989 handbook containing the provisions permitting unilateral modification or cancellation, it did not bargain with those pre-1989 employees who had seniority rights under the old handbooks, did not ask for or obtain their assent, and did not provide consideration other than continued employment. The employees signed a receipt for the 1989 handbook stating that they had received the handbook, understood that it was their responsibility to read it, comply with its contents, and contact Personnel if they had any questions concerning the contents. The Demasse employees were not informed that continued employment—showing up for work the next day—would manifest assent, constitute consideration, and permit cancellation of any employment rights to which they were contractually entitled.

> \* \* \*
>
> In the briefs and at oral argument, as well in the dissents, there was a note of concern that holding that an employer could not cancel existing contractual terms by issuing a new handbook would be a radical departure from Arizona law. We blaze no new ground in this opinion. It has always been Arizona law that a contract, once made, must be performed according to its terms and that any modification of those terms must be made by mutual assent and for consideration. To those who believe our conclusion will destroy an employer's ability to update and modernize its handbook, we can only reply that the great majority of handbook terms are certainly non-contractual and can be revised, that the existence of contractual terms can be disclaimed in the handbook in effect at the time of hiring and, if not, permission to modify can always be obtained by mutual agreement and for consideration. In all other instances, the contract rule is and has always been that one should keep one's promises.

*Id.* at 1144-1148.

At first blush, *Demasse* seems to provide support for Plaintiff's position in this case. *Demasse* requires "affirmative steps" to accept an offer to modify an existing contract and places the burden on the offeror to show that the offeree "assented with knowledge of the attempted modification and understanding of its impact on the underlying contract." *Id.* at 1145. *Demasse* also states that legally adequate notice is "more than the employee's awareness of or receipt of the newest handbook. An employee must be informed of any new term, aware of its impact on the pre-existing contract, and affirmatively consent to it to accept the offered modification." *Id.* at 1146. These statements are difficult to reconcile with Desert Financial's position in this case, which is that a valid contract modification can occur simply by emailing notice of the proposed modification to a contractual counterparty, irrespective of whether the counterparty even opens and reads the email or takes affirmative steps to accept the proposed modification. Additionally, although Desert Financial suggests that *Demasse* is an employment-specific case that has no applicability in the context of consumer contracts, several of *Demasse*'s passages can be read as suggesting that the opinion was not intended to be limited to the employment context, but rather was grounded in generally applicable principles of contract law. For example, the court noted

1   that, "as with other contracts, an implied-in-fact contract term cannot be modified
2   unilaterally" and that "[t]he cases dealing with employment contracts are merely part of
3   the general rule that recognizes no difference in legal effect between an express and an
4   implied contract." *Id.* at 1144-45. The court also stated that "[r]equiring an offeree to take
5   affirmative steps to reject an offer . . . is inconsistent with general contract law." *Id.*
6   at 1146. Finally, the court observed that "the great majority of handbook terms are
7   certainly non-contractual and can be revised . . . . In all other instances, the contract rule is
8   and has always been that one should keep one's promises." *Id.* at 1148. Given these
9   statements, there is a fair argument that *Demasse* should be read as articulating a general
10  rule of contract modification that the Arizona Supreme Court then happened to apply to a
11  dispute arising in the employment context.

12       On the other hand, although *Demasse* does not explicitly cabin itself to employment
13  contracts (and, as noted, contains various passages that suggest it should not be so cabined),
14  it also does not explicitly state that its holding should extend *beyond* employment.
15  Additionally, some aspects of the court's analysis seem to be rooted in employment-
16  specific considerations. For example, the court concluded that "affirmative steps" should
17  be required to accept a modification offer because "otherwise . . . plaintiffs would be forced
18  to quit" and "[i]t is too much to require an employee to preserve his or her rights under the
19  original employment contract by quitting working." 984 P.2d at 1145 (citation and internal
20  quotation marks omitted). But such considerations are arguably not present in the context
21  of consumer contracts, such as Plaintiff's contract with Desert Financial to open and
22  maintain a bank account.

23       This is only one of several reasons to suspect the Arizona Supreme Court might
24  apply a stringent modification requirement in the context of employment contracts while
25  allowing consumer contracts to be modified more easily. The Arizona Supreme Court has
26  elsewhere deemed standardized contracts "essential to a system of mass production and
27  distribution" and endorsed the notion that "those who make use of a standardized form of
28  agreement neither expect nor desire their customers to understand or even to read the

standard terms. On the other hand, customers trust to the good faith of the party using the form [and] . . . understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose." *Darner Motor Sales v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 391 (Ariz. 1984). And whatever concerns prompted the Arizona Supreme Court to endorse the standardization and rapid execution of contracts in 1984 may be even more pertinent today. For example, in 1984, almost no Arizonans were online—today, nearly all of them are.

In a related vein, it appears that "California has a well-developed body of law concerning electronic consumer agreements" under which "courts apply the theories of 'constructive notice' and 'inquiry notice,' which may result in a finding of acceptance even when a consumer does not have actual notice of a contract's terms." (Doc. 26 at 9.) Although Arizona is, of course, free to adopt rules and legal doctrines that differ from those followed in neighboring states, it is not obvious that Arizona has made an intentional choice to deviate from California's approach in this area and adopt a rule that makes it more difficult to modify consumer agreements.

Desert Financial's invocation of the tentative draft of the Restatement of the Law, Consumer Contracts provides another reason to question whether the Arizona Supreme Court would apply *Demasse*'s stringent modification rule in the context of consumer contracts. Section 3(a) of that portion of the Restatement provides as follows:

> (a) A standard contract term in a consumer contract governing an ongoing relationship is modified if:
>
> (1) the consumer receives a reasonable notice of the proposed modified term and a reasonable opportunity to review it;
>
> (2) the consumer receives a reasonable opportunity to reject the proposed modified term and continue the contractual relationship under the existing term, and a reasonable notice of this opportunity; and
>
> (3) the consumer either (A) manifests assent to the modified term or (B) does not reject the proposed modified term and continues the contractual relationship after the expiration of the rejection period provided in the proposal.

- 12 -

Restatement of the Law, Consumer Contracts § 3 (Am. Law. Inst. Tentative Draft 2019). As Desert Financial notes in its supplemental brief, there is a strong argument that the modification effort in this case would be considered valid under § 3(a). *See also id.* cmt. 2, illus. 1 ("A consumer opens a checking account with a bank and signs a user agreement. The bank seeks to change the terms of the agreement occasionally and sends notices to the consumer in advance of each such change. Each change of terms is a proposed modification under this Section . . . ."). The potential conflict between *Demasse*, which sets forth a relatively stringent modification requirement, and § 3(a) of the Restatement, which calls for a less onerous requirement, presents a dilemma because, "[a]bsent controlling authority to the contrary," Arizona courts "generally follow the Restatement when it sets forth sound legal policy." *In re Sky Harbor Hotel Props., LLC*, 443 P.3d 21, 23 (Ariz. 2019). *See also In re Krohn*, 52 P.3d 774, 779 (Ariz. 2002) ("We have long followed the rule that where not bound by our previous decisions or by legislative enactment, we would follow the Restatement of the Law.") (cleaned up).[3]

The parties' supplemental briefs also contain citations to an array of decisions by federal district courts and other courts applying Arizona law. As an initial matter, because those decisions simply represent attempts to discern the law the Arizona Supreme Court would deem applicable in this circumstance (an exercise the Court is repeating here), they are not dispositive. Additionally, many of the parties' cited cases are inapposite.[4] Finally, and most important, although the parties have been able to identify certain authorities that

---

[3] Although the provision cited by Desert Financial appears in a tentative draft of the Restatement, Arizona's general policy of following the Restatement seems to apply to tentative provisions, too. *See, e.g., Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977) ("We hold the standard adopted in the Tentative Draft of the American Law Institute, Restatement (Second) of Torts . . . is the standard to be followed in this State.").

[4] The inapposite cases include *Vantage Mobility*, *Edwards*, and *Hagin*. *Vantage Mobility* stands for the uncontested proposition that "a contract cannot be unilaterally modified nor can one party to a contract alter its terms without the assent of the other party," but it does not discuss assent with the level of specificity this case demands. 2021 WL 1610229 at *13-14. *Edwards* analyzes whether an arbitration agreement was agreed to, but it is inapposite because the original contract was never modified. 2018 WL 637382. *Hagin* is a 1960 Arizona Supreme Court case that applies a theory of inquiry notice to insurance policies, 353 P.2d 1029, but if the 1999 *Demasse* opinion establishes universal principles of contractual modification, it would overrule anything to the contrary in *Hagin*.

tend to support their respective positions,[5] the overall takeaway is that other courts have reached conflicting and difficult-to-reconcile conclusions about the current state of Arizona's law of contract modification. In the Court's view, this lack of unanimity is further evidence that the legal issue presented in this case is unsettled and would benefit from clarification.

II. Certification

A. **Certification Standard**

"Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and hel[p] build a cooperative judicial federalism." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 77 (1997) (citations and internal quotation marks omitted). *See also Benson v. Casa de Capri Enterprises, LLC*, 980 F.3d 1328, 1332 (9th Cir. 2020) ("In the absence of any apparent controlling precedent, and out of respect for Arizona courts and their preeminent role in interpreting Arizona law, we believe it most suitable to certify this issue to the highest court of the state whose law is in question.") (citation and internal quotation marks omitted). The Arizona Supreme Court may accept a request for certification only if the question to be resolved "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the intermediate appellate courts of

---

[5] For example, in *Taleb v. AutoNation USA Corp.*, 2006 WL 3716922 (D. Ariz. 2006), the court held that "[t]he holding of the Arizona Supreme Court in *DeMasse* is limited to situations in which an employer attempts to unilaterally modify a contract that creates an expectation of job security." *Id.* at *5. In contrast, in *Rose*, the court did not seem to view *Demasse* as being limited in this fashion. There, the issue was whether an insurance company had validly modified its "Producer Agreement" with one of its brokers by emailing a notice to the broker, 11 years after the agreement was originally signed, announcing the addition of an arbitration clause. 2018 WL 888982 at *1. Citing *Demasse*, the court concluded that the insurance company's modification attempt was unsuccessful because "even if . . . Humana's evidence of sending the email is accepted as true, it shows only that an email was sent to Plaintiff and not rejected by her server. It does not show that Plaintiff read the email or the allegedly attached amendments, and it does not show that she understood the email and assented to the arbitration agreement it contained." *Id.* at *3. Unlike in *Taleb*, there was no discussion of whether the broker's contract with the insurance company created an expectation of job security and whether the presence of such an expectation had any bearing on the contract-modification analysis.

this state." A.R.S. § 12-1861.

These requirements are satisfied here. First, as discussed above, this case presents a "novel or unsettled question[] of state law" as to which "there is no controlling precedent" from the Arizona appellate courts. *Arizonans for Off. Eng.*, 520 U.S. at 77; A.R.S. § 12-1861. Notably, in *Sears Roebuck*, the North Carolina Court of Appeals was asked to decide the enforceability of an agreement to arbitrate under Arizona law. 593 S.E.2d at 424. It correctly observed that "Arizona's appellate courts have not squarely addressed the issue presented by this appeal" and was forced to rely on *Demasse* and fill in the cracks with California caselaw. *Id.* at 431. Over 15 years have passed since that decision, yet the legal landscape is no clearer today.

Second, the disputed issue "may be determinative of the cause then pending in the certifying court." A.R.S. § 12-1861. If, as Desert Financial contends, Plaintiff's claims in this action are subject to arbitration, there will be no occasion for the Court to address the merits of her claims.

Certification seems particularly appropriate here because it will promote values of comity and federalism. This case presents a pure issue of contract law that is likely to recur. "Contract law is," at its essence, "a set of policy judgments concerning how to decide the meaning of private agreements, which private agreements should be legally enforceable, and what remedy to afford for their breach." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 247-48 (1995) (O'Connor, J., concurring and dissenting in part). It promotes judicial federalism to allow state courts to "decide [whether] to force parties to comply with a contract," given that they are most qualified to determine whether "state policy, as expressed in its contract law, will be advanced by that decision." *Id. See also Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1005 (11th Cir. 2013) (certifying question to the Oklahoma Supreme Court concerning whether an arbitration agreement was incorporated by reference into a consumer contract and explaining that "[i]t is particularly appropriate for the state court to define the law here because of the possibility that it will be influenced by state policy concerns relating to consumer contracts").

B. **Certification Order**

Under Arizona Supreme Court Rule 27(a)(3), "[t]he certification order shall set forth: (A) The questions of law to be answered; (B) A statement of all facts relevant to the questions certified; (C) A list of the counsel (or pro se parties) appearing in the matter, together with their addresses and telephone numbers; (D) The proportions in which the parties shall share the required filing fees, if such proportions are not to be equal; (E) Any other matters that the certifying court deems relevant to a determination of the questions certified."

Here, the information required by subdivisions (B) and (E) is set forth in earlier portions of this order. As for subdivision (A), the Court certifies two questions of law to the Arizona Supreme Court:

    (1)    Does an effective modification of a consumer contract occur when the offeror sends notice of the proposed modification to the offeree, through a communication channel to which the offeree previously consented, even if the offeree fails to respond?

    (2)    If not, what additional showings (such as actual receipt of the notice of proposed modification, subjective understanding of the proposed modification, or affirmative consent to the proposed modification) are necessary to achieve an effective contract modification in this circumstance?

To be clear, the "phrasing of the questions should not restrict the Court's consideration of the issues involved. . . . [T]he Court may reformulate the relevant state law questions as it perceives them to be, in light of the contentions of the parties." *Raynor v. United of Omaha Life Ins. Co.*, 858 F.3d 1268, 1273 (9th Cir. 2017) (quotations and alterations omitted).

As for subdivision (C), the information is as follows:

▪ Counsel for Plaintiff: Cindy C. Albracht-Crogan and Kaysey L. Fung, Cohen Dowd Quigley, 2425 East Camelback Road, Suite 1100, Phoenix, AZ 85016, (602) 252-8400; Richard D. McCune and David C. Wright, McCune Wright Arevalo, LLP, 3281 East Guasti Road, Suite 100, Ontario, CA 91761, (909) 557-1250; Emily

J. Kirk, McCune Wright Arevalo, LLP, 231 North Main Street, Suite 20, Edwardsville, IL 62025, (618) 307-6116.

▪ Counsel for Defendant: Brian A. Cabianca and David S. Norris, Squire Patton Boggs (US) LLP, 1 East Washington Street, Suite 2700, Phoenix, AZ 85004, (602) 528-4000.

As for subdivision (D), the parties shall share the required filing fees in equal proportions.

***

Accordingly,

**IT IS ORDERED** that:

1. The aforementioned two questions are **certified** to the Arizona Supreme Court.

2. The Clerk is directed to file a certified copy of this order with the Arizona Supreme Court under Arizona Supreme Court Rule 27.

3. This action is **stayed** pending a response from the Arizona Supreme Court.

Dated this 11th day of March, 2022.

Dominic W. Lanza
United States District Judge