**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Eva Cornell,

           Plaintiff,

v.

Desert Financial Credit Union, et al.,

           Defendants.

No. CV-21-00835-PHX-DWL

**ORDER**

## INTRODUCTION

In this putative class action, Eva Cornell ("Plaintiff") alleges that Desert Financial Credit Union ("Desert Financial") violated certain federal regulations that require clear disclosure of a bank's overdraft practices. (Doc. 1.) Desert Financial has, in turn, moved to compel arbitration based on an arbitration clause that it added to its standard terms several years after Plaintiff opened her account. (Doc. 11.) After soliciting supplemental briefing on whether adding this clause resulted in a valid contract modification under Arizona law (Doc. 26), the Court concluded that "the most prudent course of action is to conduct further fact-finding and then seek certification from the Arizona Supreme Court on the unsettled legal issue that lies at the heart of the parties' dispute." (Doc. 38.)

To that end, the Court held an evidentiary hearing. (Doc. 44.) The evidence presented during the hearing establishes that, in April 2021, Plaintiff received, downloaded, and viewed a statement from Desert Financial that contained a notice of the change. This notice also identified a website that Plaintiff could visit to obtain more information about

the change.  However, the notice itself did not inform Plaintiff that she had the right to opt out of the change.  Plaintiff did not visit the website, remained subjectively unaware that an arbitration provision had been added, and did not opt out by the specified deadline.

After the evidentiary hearing, the Court certified two questions of law to the Arizona Supreme Court: "(1) Does an effective modification of a consumer contract occur when the offeror sends notice of the proposed modification to the offeree, through a communication channel to which the offeree previously consented, even if the offeree fails to respond?"; and "(2) If not, what additional showings (such as actual receipt of the notice of proposed modification, subjective understanding of the proposed modification, or affirmative consent to the proposed modification) are necessary to achieve an effective contract modification in this circumstance?"  (Doc. 52 at 16.)  The Arizona Supreme Court has now responded, holding: "[O]n-going, at-will, consumer-business relationships consist of the day-to-day offer and acceptance of unilateral contracts; thus, businesses may effectively modify the non-negotiated, standardized terms governing these relationships if the business demonstrates that (1) the contract's initial terms expressly notified the consumer that the business could make future changes to the terms; (2) the business gave— and the consumer received—reasonable notice of the modification and an opportunity to opt out with no change to the status quo business relationship; and (3) the consumer continued the business relationship past a reasonable opt-out period."  *Cornell v. Desert Fin. Credit Union*, 524 P.3d 1133, 1135 (Ariz. 2023).

Following the issuance of the Arizona Supreme Court's decision, the Court solicited supplemental briefing from the parties regarding Desert Financial's still-pending motion to compel arbitration.  (Doc. 67.)  Additionally, after reviewing the parties' supplemental briefing (Doc. 69-72), the Court solicited still-more briefing on a discrete issue (Doc. 73), which the parties have now provided (Docs. 74-75).  As explained below, the most recent round of briefing persuades the Court that Desert Financial's motion to compel arbitration must be denied.

…

**BACKGROUND**

I.   <u>Factual Background</u>

The facts are largely the same as those laid out in the Court's certification order. (Doc. 52.)   The following summary is based on the evidence submitted during the evidentiary hearing and other materials in the record.   Any factual disputes were resolved by the Court in its capacity as the finder of fact.   (Doc. 38 at 15-16.)

In October 2018, Plaintiff applied to Desert Financial to open a "Membership Savings" account and a "Desert Connect Checking" account.   (Doc. 52 at 2.)   In each application, Plaintiff "agree[d] to the terms and conditions of any account that I/we have applied for, and agree[d] that the credit union may change those terms and conditions from time to time."   (*Id.*)   Plaintiff also consented to the electronic delivery of all future communications from Desert Financial, including all disclosures, notices, and account statements.   (*Id.*)

When Plaintiff opened her accounts, Desert Financial's Statements of Terms, Conditions, and Disclosures ("Terms") did not include an arbitration clause.   (*Id.*)[1]

In February 2021, Desert Financial updated its Terms to add an arbitration clause. (*Id.*)   The clause was added in Section 28, which appears on page five of a fourteen-page document.   (*Id.*)   The new clause began as follows: "**<u>DISPUTE RESOLUTION;</u> <u>MANDATORY ARBITRATION</u>.   READ THIS PROVISION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND THE CREDIT UNION HAVE AGAINST EACH OTHER WILL BE RESOLVED**." (*Id.*)   The bolded, partially underlined, all-caps format of this clause made it stand out from other portions of the document.   (*Id.* at 2-3.)   The new clause went on to explain that "[a]rbitration is not a mandatory condition of you maintaining an account with Credit Union.   If you do not want to be subject to this arbitration provision, YOU MAY OPT

---

[1]      Although Plaintiff was unaware of the presence or absence of an arbitration clause when she opened the accounts and testified during her deposition that she would have opened the accounts even if she had known that disputes would be subject to arbitration (Doc. 52 at 2), these details are ultimately irrelevant to the contract modification analysis.

OUT of this arbitration provision so long as the Credit Union receives notice of your desire to opt-out by April 30, 2021 or 30 days after you open your account, whichever is later." (*Id.* at 3.)  The clause also provided details on how to complete the opt-out process.[2]  (*Id.*)

Desert Financial did not send the new version of its Terms to Plaintiff (or to its other 375,000 customers).  (*Id.*)  Instead, to communicate the change, Desert Financial inserted the following orange-and-blue banner on the first page of its next cycle of monthly account statements:



(*Id.*)  As noted, this banner informed customers that Desert Financial had "change[d] how we will resolve legal disputes related to your accounts at Desert Financial," provided a URL that customers could use to view the latest version of the Terms, and explained that the changes appeared in the "Dispute Resolution section" of the Terms.  (*Id.*)  The notice itself did not, however, inform customers of their right to opt out of the change.

Desert Financial began distributing the monthly statements containing this banner in increments beginning on March 5, 2021.  (Doc. 55 [hearing transcript, hereinafter "Tr."] at 51.)  In Plaintiff's case, this banner appeared on the account statement for the period of February 21, 2021 through March 20, 2021 ("the March 2021 statement").  (Doc. 52 at 3.)  Because Plaintiff chose to receive electronic delivery of communications from Desert Financial, she did not receive a hard copy of the March 2021 statement in the mail.  (*Id.*)  Instead, on March 23, 2021 (*i.e.*, five weeks before the April 30, 2021 opt-out date), she

---

[2]   "To opt out, notify Credit Union in writing by e-mail at optout@desertfinancial.com or by mail to Desert Financial Credit Union, 148 N 48th St, Phoenix, Arizona 85034, Attn: Legal Department.  Include your name, address, and a clear statement that You do not agree to this Arbitration Provision."  (Doc. 12-4 at 7.)

received an email from Desert Financial notifying her that her most recent monthly statement was available. (*Id.*)

The orange-and-blue-banner was only present in the HTML version of Plaintiff's March 2021 statement from March 23, 2021 through April 1, 2021. (*Id.* at 4 n.2.) After that date, Desert Financial swapped the banner in the HTML version for the next month's notice or advertisement. (*Id.*) Thus, after April 1, 2021, Plaintiff could only see the change-in-terms banner in the .pdf version of her March 2021 statement. (*Id.*)

During the early stages of this case, Plaintiff submitted a declaration avowing that she had never "seen" the March 2021 statement. (Doc. 18-1 ¶ 3.) During the evidentiary hearing, Desert Financial proved otherwise.

The relevant events occurred on April 13, 2021 and were precipitated by Plaintiff's efforts to buy a car from a car dealership. (Doc. 52 at 4.) As part of the financing process, the dealership asked Plaintiff to provide her three most recent bank statements. (*Id.*) In response, Plaintiff attempted to download the statements via Desert Financial's mobile banking application. (*Id.*) During the download process, Plaintiff not only viewed HTML versions of her monthly statements for January 2021, February 2021, and March 2021 via the app but also opened and saved a .pdf version of each monthly statement. (*Id.*) This distinction is important because, although the HTML version of the March 2021 statement no longer contained the orange-and-blue banner notifying customers about the change to the Terms, the .pdf version of the March 2021 statement did. (*Id.*) Thus, Plaintiff saw (however briefly) the notice regarding the change in Terms, which appeared in the March 2021 statement, during the download process. (*Id.*)

Although Plaintiff successfully downloaded the three monthly statements onto her phone via the app, she couldn't locate them on her phone afterward. (*Id.*) As a result, she called Desert Financial to request copies of the monthly statements. (*Id.*) After some discussion, Desert Financial's customer service representative transmitted the three monthly statements to Plaintiff via a third-party service called DocuSign. (*Id.*) Plaintiff, in turn, forwarded one of the DocuSign emails to the car dealership and provided a

password so the dealership could download the statements.  (*Id.*)

During the evidentiary hearing, the parties presented an array of technical evidence concerning the DocuSign transmission and downloading process.  (*Id.*)  From that evidence, it is clear that Plaintiff saw (however briefly) a copy of the March 2021 statement containing the blue-and-orange notice at some point before she forwarded the DocuSign materials to the dealership.  (*Id.*)  This means that Plaintiff saw the blue-and-orange notice twice on April 13, 2021—once when downloading the March 2021 statement via the mobile app, and again when obtaining a copy of the March 2021 statement from Desert Financial via DocuSign.  (*Id.* at 4-5.)

There is no evidence that Plaintiff ever visited the URL identified in the blue-and-orange banner notice to review the updated version of the Terms.  (*Id.* at 5.)  Had Plaintiff done so, she would have been directed to a website containing several documents.  (Tr. at 49.)  Plaintiff then would have had to navigate to the document containing a copy of Desert Financial's current Terms.  (Tr. at 49, 52.)  As noted, the Dispute Resolution provision appears on page 5 of the Terms and is emphasized by bold and underlined font and capital letters.  (Doc. 52 at 2.)

Desert Financial did not provide online access to prior versions of the Terms.  (Tr. at 53-56.)  Instead, a customer could obtain a copy by calling Desert Financial or walking into a branch location.  (*Id.* at 56.)

Plaintiff testified that she was then, and remains now, unfamiliar with the concept of legal arbitration (and legal terms in general).  (Doc. 52 at 5.)  Given that Plaintiff did not visit the website that contained the updated Terms, and that Plaintiff had little familiarity with how "legal disputes" are "resolve[d]" when she saw the notice, the Court finds that Plaintiff was subjectively unaware that Desert Financial had modified the Terms in February 2021 to add an arbitration provision.  (*Id.*)  Plaintiff was also subjectively unaware of the opt-out provision.

Unsurprisingly, then, it is undisputed that Plaintiff never opted out of the arbitration provision pursuant to the opt-out process described in the Terms.  (*Id.*)  Instead, she

continued her banking relationship with Desert Financial past the opt-out deadline.

II.     Relevant Procedural Background

On May 5, 2021, Plaintiff filed the complaint.  (Doc. 1.)

On June 24, 2021, Desert Financial moved to compel arbitration.  (Doc. 11.)

On July 26, 2021, Plaintiff filed a response.  (Doc. 18.)

On August 24, 2021, Desert Financial filed a reply.  (Doc. 22.)

On October 8, 2021, the Court ordered supplemental briefing.  (Doc. 26.)

On October 22, 2021, the parties filed their supplemental briefs.  (Docs. 29, 30.) Desert Financial included, in its supplemental brief, a request for certification to the Arizona Supreme Court.  (Doc. 29 at 4 n.1.)  That same day, Desert Financial filed a motion for an evidentiary hearing.  (Doc. 31.)

On November 16, 2021, the Court heard oral argument.  (Doc. 37.)

On November 17, 2021, the Court granted Desert Financial's request for an evidentiary hearing and suggested that certification to the Arizona Supreme Court would be appropriate following the evidentiary hearing.  (Doc. 38.)

On March 8, 2022, the Court held the evidentiary hearing.  (Doc. 44.)

On March 11, 2022, the Court certified two questions of law to the Arizona Supreme Court.  (Doc. 52.)

On March 2, 2023, the Arizona Supreme Court issued its opinion answering the certified questions.  *Cornell*, 524 P.3d 1133.

On March 15, 2023, at the Court's direction, the parties submitted a joint notice concerning how to proceed.  (Doc. 66.)  The same day, the Court set a briefing schedule. (Doc. 67.)  The parties then submitted supplemental briefing.  (Docs. 69-72.)

On July 19, 2023, after reviewing the supplemental briefing, the Court ordered additional briefing on a discrete issue.  (Doc. 73.)  That additional briefing process is now complete.  (Docs. 74-75.)

…

…

**DISCUSSION**

I.    <u>Legal Standard</u>

The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. Under the FAA, written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* Thus, absent a valid contractual defense, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

In general, a district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). These two issues are sometimes referred to as the "gateway" questions of arbitrability. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). Here, the only disputed gateway issue is whether a valid agreement to arbitrate exists. Desert Financial, as the party seeking to compel arbitration, "bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence." *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1005 (9th Cir. 2010).

Courts look to state law to determine whether a valid agreement to arbitrate exists. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014). Here, the parties agree that Arizona law applies. (Doc. 18 at 4; Doc. 22 at 3.) As explained by the Arizona Supreme Court, whether Desert Financial's purported modification of its contract with Plaintiff to add an arbitration clause was valid under Arizona law turns on whether Desert Financial can satisfy the requirements set out in the draft of the Restatement On Consumer Contracts § 3 (Am. L. Inst., Tentative Draft No. 2, 2022). *Cornell*, 524 P.3d at 1139-40. That provision, in full, provides as follows:

…

(a)    A modification proposed by the business of a standard contract term in a consumer contract governing an ongoing relationship is adopted if the business demonstrates that:

    (1)    the consumer received reasonable notice of the proposed modified term and a reasonable opportunity to review it;

    (2)    the consumer received a reasonable opportunity, including reasonable notice of the opportunity, to reject the proposed modified term and continue the contractual relationship under the existing term, and;

    (3)    the consumer received reasonable notice that continuing the contractual relationship without rejecting the proposed modified term will result in the modification being adopted; and

    (4)    the consumer either:

        (A)    manifested assent to the modified term, or

        (B)    did not reject the proposed modified term and continued to take the benefit of the contractual relationship after the expiration of the rejection period provided in the proposal.

(b)    A consumer contract governing an ongoing relationship may provide for a reasonable procedure for adoption of modified terms under which the business may propose a modification of the standard contract terms but may not, to the detriment of the consumer, exclude the application of subsection (a), except that the established procedure may replace the reasonable opportunity to reject the proposed modified term with a reasonable opportunity to terminate the transaction without unreasonable cost, loss of value, or personal burden.

(c)    A modification by the business of a standard contract term in a consumer contract is adopted only if the modification is proposed in good faith, if it is fair and equitable, and if it does not have the effect of undermining an affirmation or promise made by the business that was made part of the basis of the original bargain between the business and the consumer.

(d)    Standard contract terms may not be modified in a consumer contract that has been substantially performed by at least one party.

*Id*. The Arizona Supreme Court summarized the requirements of § 3(a) as follows: "[B]usinesses may effectively modify the non-negotiated, standardized terms governing [on-going, at-will, consumer-business] relationships if the business demonstrates that (1) the contract's initial terms expressly notified the consumer that the business could make future changes to the terms; (2) the business gave—and the consumer received—

reasonable notice of the modification and an opportunity to opt out with no change to the status quo business relationship; and (3) the consumer continued the business relationship past a reasonable opt-out period." *Cornell*, 524 P.3d at 1135.

II.   Modification Under § 3(a)

In their supplemental briefing, the parties focus most of their arguments on whether Desert Financial's modification attempt was valid under § 3(a).  As discussed below, the Court concludes that Desert Financial failed to fully satisfy the second element of § 3(a) in light of how that element was interpreted by the Arizona Supreme Court in *Cornell*.  Nevertheless, in an abundance of caution and in an attempt to create a complete record in the event of appeal, the Court addresses all of the § 3(a) elements.

A.   **First Element: Express Notice Of Possible Future Modifications**

The first requirement for a valid consumer contract modification under § 3(a) is that "the contract's initial terms expressly notified the consumer that the business could make future changes to the terms."  *Cornell*, 524 P.3d at 1135.

Desert Financial argues this element is satisfied because "the initial terms allowed future changes by providing that Desert Financial 'may, at any time, change these [terms] by providing you with the appropriate notice required by law' and that '[b]y continuing to maintain your accounts at Credit Union after such changes occur, you agree to be bound by these changes.'"  (Doc. 69 at 2-3, citations omitted.)  Plaintiff doesn't meaningfully dispute Desert Financial's argument on this point.[3]

The Court agrees with Desert Financial that the first element is satisfied.  It is undisputed that the Terms in effect at the time Plaintiff opened her account provided express notice that the Terms were subject to change.  (Doc. 12-3 at 2.)  This, alone, is sufficient—the Court does not construe the Arizona Supreme Court's decision as requiring any showing that the consumer was subjectively aware of this provision's existence.

---

[3]    Although Plaintiff's initial supplemental brief asserts in passing that the "alleged modification fails all three parts" of the applicable test (Doc. 70 at 2), Plaintiff does not develop any reasoned argument as to the first element and acknowledges that "[w]hen [she] opened her account, she agreed to the terms governing her account at that time" (*id.* at 3).

Rather, it is enough that (as here) the Terms themselves provided express notice of the possibility of future changes.

At any rate, the Court specifically found following the evidentiary hearing that when Plaintiff signed up for her checking account with Desert Financial, she both acknowledged that Desert Financial may change the Terms from time to time and elected to receive those updated notifications via email.  (Doc. 52 at 2.)  This serves as an additional reason why the first element is satisfied.

### B.   **Second Element: Reasonable Notice**

The second requirement for a valid consumer contract modification under § 3(a) is that "the business gave—and the consumer received—reasonable notice of the modification and an opportunity to opt out with no change to the status quo business relationship."  *Cornell*, 524 P.3d at 1135.  As explained below, the Court concludes that Desert Financial failed to fully satisfy this requirement—although its notice of the modification was reasonable, its notice regarding opt-out rights and consequences was not.

### 1.   Reasonable Notice Of The Modification

The first part of the "reasonable notice" requirement concerns notice of the actual modification.  The starting point for evaluating reasonableness in this context is comment 1 to the Restatement § 3, which explains that "the process of adoption of a modification must satisfy requirements of assent analogous to those in § 2.  *Id.*  Comment 2 to the Restatement § 2, in turn, explains that reasonableness is a "totality of the circumstances" inquiry that "requires a case-by-case, fact-intensive analysis in light of the ordinary behavior and perspective of consumers engaged in the type of transaction at issue and their interaction with the business."  *Id.*  Some of the suggested factors to consider are "the form and nature of the transaction; the clarity, sequence, flow, and simplicity of the communication of the terms; the design, layout, and content of the interface; the nature of the transaction; the totality of the consumer's interactions with the business; the difficulty of identifying the notices and finding the location of the terms; the prominence of notices regarding important terms and their nature; and the visibility and clarity of the language

alerting consumers that specific steps will result in the adoption of the terms as part of the contract with the business, as well as the manner in which the consumer is asked to manifest assent to the transaction and acknowledge the adoption of the standard contract terms." *Id. See also* Restatement § 3 cmt. 3 (referencing § 2 cmt. 2).

Applying these standards, it is clear that if Desert Financial had simply modified the version of its Terms appearing on its website to add an arbitration clause, without providing some sort of affirmative notice to consumers regarding the change, the modification attempt would have been invalid. Illustration 5 to Restatement § 3 explains that a business must "provide the consumer with a distinct or separate notice of the modification" because it is "not reasonable to expect consumers to revisit and check the Terms and Conditions web page regularly."

Here, Desert Financial provided affirmative notice of the change via the brightly colored banner appearing in its March 2021 statements. Illustration 6 to Restatement § 3 is helpful in evaluating the reasonableness of this approach. Illustration 6 explains that if a bank sought to change its standard terms by enclosing, as an attachment to a customer's monthly statement, "a separate sheet titled 'Change of Terms' that describes specific changes to the agreement and the effective date of those changes," this approach would "satisf[y] the reasonable notice requirement."

Desert Financial did not do exactly what Illustration 6 contemplates—it provided the notice in a brightly colored banner appearing on the first page of each March 2021 statement, as opposed to providing the notice as a separate document attached to each March 2021 statement. In the paragraphs that follow, the Court addresses the specifics of this banner and the reasonableness of the notice it imparted. Nevertheless, the Court concludes that Illustration 6 still supports, as a general matter, the reasonableness of Desert Financial's approach. The principle to be distilled from Illustration 6 is that it is permissible for a bank to provide notice of a change to its standard terms and conditions by providing that notice as part of its monthly statement distribution process. That is exactly what Desert Financial did here. Plaintiff criticizes Desert Financial for not

affirmatively informing her, in the email announcing that her March 2021 statement was available, that the statement contained any updated terms for her to review (Doc. 70 at 9), but the Court cannot see how that renders the notice unreasonable. If, for example, Plaintiff had not agreed to receive her monthly statements by email, then Desert Financial would have simply mailed her the March 2021 statement. And as Illustration 6 explains, if Desert Financial had included, as part of that mailing, adequate notice of the relevant changes, Desert Financial would have satisfied the first part of the reasonable notice requirement. It makes no sense to suggest, as Plaintiff does, that banks choosing to distribute their monthly statements via email instead of regular mail should be subject to heightened notice requirements.

Turning to the banner included within the March 2021 monthly statements, the content, format, and layout weigh strongly in favor of reasonableness (or, at least, reasonableness as to the existence of a modification). Contrary to Plaintiff's argument, the notice is clear. The brightly colored banner takes up nearly one-third of the page. Even when reproduced in black and white, the "Change-in-Terms" banner is conspicuously placed, in a large and bold font.[4] Rather than a block of text, which may be overwhelming to a consumer, the text is short and written in plain English instead of legal jargon. *See* Restatement § 2 cmt. 2 (encouraging courts to consider "the clarity" and "simplicity" of the communication). Desert Financial told customers what was changing ("how we will resolve legal disputes related to your accounts at Desert Financial"), directed them to the specific provision ("see the Dispute Resolution section of the Statements of Terms, Conditions, and Disclosures"), and then provided the website link (both in bold font and again in its own highlighted text box) that would lead customers directly to the updated Terms.

Because this information was conveyed in such a clear and conspicuous manner, the Court concludes that although Desert Financial's decision to provide the modification

---

[4]     While not argued by the parties, the Court also notes that the icon of the contract and the magnifying glass helped indicate that a customer should look more closely at the notice.

notice via a banner appearing on the first page of its monthly statements differs from the approach contemplated in Illustration 6 (*i.e.*, providing the notice "on a separate sheet titled 'Change of Terms'"), this difference does not detract from the reasonableness of Desert Financial's approach.  On this point, it is again helpful to consider the hypothetical of a customer who has only agreed to receive her monthly statements in the mail.  Under the approach contemplated in Illustration 6, that customer would receive a single envelope in the mail that includes two documents—the monthly statement plus the separate notice entitled "Change of Terms."  It's conceivable that such a customer might tear open the envelope, glance at her monthly statement, and not even notice that a separate notice was appended to it.  In contrast, under Desert Financial's approach, the very first thing that would grab the customer's eye upon opening the envelope would be the conspicuous orange-and-blue banner on the first page announcing the change in terms.[5]  At a minimum, both approaches are reasonably calculated to provide notice of a modification.

Plaintiff also questions the reasonableness of Desert Financial's notification effort by noting that, upon receipt of a .pdf version of the March 2021 statement, a consumer would have to manually type in the website link.  (Doc. 70 at 12 ["Thus, even in a best-case scenario, Plaintiff could have only exercised her opt-out rights had she . . . [t]yped the web address provided on the statement into a browser on her phone . . . ."].)  Had the URL included a long string of seemingly random characters that would be difficult to follow or re-copy, this argument might have more force.  But the URL here was simply "DesertFinancial.com/Disclosures."  This would not be too complicated for the average person to type.  *See* Restatement § 2 cmt. 2 (encouraging courts to consider "the difficulty of identifying the notices and finding the location of the terms").

---

[5]      Likewise, if a bank attempted to follow the Illustration 6 approach in the case of customers who opted to receive their monthly statements via email, it might simply append, to the end of the .pdf file containing the monthly statement, the notice of the change in terms.  A customer opening and reviewing such a .pdf file might not even notice that it is longer than usual and contains the additional notice.  If that approach is reasonable, so too is including a brightly colored and conspicuous banner on the first page of the monthly statement.

Plaintiff also contends that the website was difficult to navigate (Doc. 70 at 12-13), but this contention is belied by the record.  Desert Financial included in its briefing a copy of Exhibit 101 from the evidentiary hearing, which demonstrates that the website prominently displayed the various links a customer would see:

## IMPORTANT DISCLOSURES

Thank you for opening an account with us. Please take a few moments to review these important disclosures.

Fee Schedule
Privacy Policy
Statements of Terms, Conditions & Disclosures
Rates
Locations
Electronic Consent Disclosures
Card Overdraft Form
Online Banking and Mobile Banking Terms and Conditions
Privilege Pay

(Doc. 72 at 7.)  As noted, "Statements of Terms, Conditions & Disclosures" was third down from the top.  This was a reasonable, non-confusing method of conveying the necessary information.  *See* Restatement § 2 cmt. 2 (encouraging courts to consider the "sequence, flow, and simplicity of the communication of the terms").

The Court also concludes that a reasonable customer would be able to navigate to the Dispute Resolution section of the updated Terms.  Plaintiff complains that the document is 14 pages long, lacks a table of contents, and fails to provide an identifier to direct a customer to the Dispute Resolution provision.  (Doc. 70 at 4, 12-13; Doc. 71 at 5-6.)  But the absence of these features would not present barriers to a reasonable customer.  Fourteen pages is not terribly long, the banner specifically directed customers to the "Dispute Resolution section of the Statement of Terms, Conditions, and Disclosures," and that section stood out from other sections due to Desert Financial's use of bold, underlined, and capitalized text.  The Court cannot envision how a reasonable customer, who was directed to the updated Terms by the notice, could somehow overlook the Dispute

Resolution section.  *See* Restatement § 2 cmt. 2 (encouraging courts to consider "the prominence of notices regarding important terms and their nature").

Turning to the content of the updated Terms, Plaintiff argues that because a reasonable customer would not have known what the prior version of the Terms included, such a customer would not have been able to make a meaningful comparison between the old and new versions.  (Doc. 70 at 8, 11-12.)  Although this is perhaps Plaintiff's strongest argument on the issue of the reasonableness of the notice of changed terms, the Court is unpersuaded.  Section 28(f) explains, in all caps and bold font: "**THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD THE RIGHT TO LITIGATE THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE.  HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED THROUGH AN ARBITRATION**."  Later, in Section 28(g), again in all caps and bolded font, the provision explains: "**THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD THE RIGHT TO BE A PARTY TO A CLASS OR REPRESENTATIVE ACTION.  HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY THROUGH AN ARBITRATION**."  Read in context, this language reasonably denotes that something is changing—a consumer's claims against Desert Financial must now be resolved via arbitration.

In hindsight, of course, Desert Financial could have done even more to reflect that the addition of the arbitration requirement was a change from the past.  But the Restatement § 3 only requires reasonable notice of the change in terms, not best-possible-in-hindsight notice.  To that end, Illustration 7 of the Restatement § 3 provides that a proposed modification is not reasonable if a customer cannot "readily compare and analyze two such lengthy and technical documents and thus cannot effectively review the proposed modification."  As explained, here a customer could have made such a ready comparison, due to the various directions and contextual clues that Desert Financial provided—first, Desert Financial clarified in the banner notice that there was a change to "how we will

- 16 -

resolve legal disputes related to your accounts at Desert Financial" and directed customers to the Dispute Resolution section of the updated Terms; next, Desert Financial set out the Dispute Resolution section in bold, underlined, and capitalized font; and finally, Desert Financial used easy-to-understand language within the Dispute Resolution section to explain that the litigation opinion customers previously "would have had" was no longer available because customers had decided to "choose" arbitration.   Under these circumstances, a redlined copy of the original Terms or a side-by-side comparison of the original and updated Terms would not have been necessary for a reasonable customer to be able to make a meaningful comparison and understand the nature of the change.

Finally, Plaintiff contends that one of the "cascading failures rendering the modification unenforceable" was Desert Financial's decision "on April 1—only eight days after sending Plaintiff the email notice about her statement—[to] change[] the banner on all existing online statements so that it no longer revealed the Change-in-Terms banner." (Doc. 70 at 10-11.)  Desert Financial responds, in part, by emphasizing that "the banner always existed on the .pdf version of Plaintiff's online statement."  (Doc. 72 at 8.)

Before delving into the merits of this argument, it is helpful to provide the relevant (and undisputed) timeline.  On February 15, 2021, the updated version of the Terms was made available to customers on Desert Financial's website.  On March 5, 2021, Desert Financial began giving customers the "change-in-terms" notice via their monthly statements.  On March 23, 2021, Plaintiff received email notification that her March 2021 statement was available.  The banner containing the notice remained visible on HTML versions of the statements through March 31, 2021.  On April 1, 2021, the banner changed on HTML versions of the statements but remained visible on .pdf versions of the statements.  Finally, on April 13, 2021, more than two weeks before the opt-out deadline of April 30, 2021, Plaintiff twice viewed (however briefly) the archived .pdf of her March 2021 statement containing the banner.

It is unfortunate that Desert Financial's removal of the banner from HTML versions of the March 2021 statements occurred when some customers only had their statements for

one week and while the opt-out period remained open.  Nevertheless, in the Court's estimation, this doesn't override the overall reasonableness of the notice provided by Desert Financial.  The change had no effect on customers who received hard-copy or .pdf versions of their March 2021 monthly statements, and even in the case of customers who only sought to review electronic versions, the notice remained in place during the period when customers would be most likely to review their monthly statements—immediately after receiving email notification that the statement was available.  Further, although actual notice is not the standard, Plaintiff had actual notice of the banner, which she viewed twice on April 13, 2021.[6]

Accordingly, under the totality of the circumstances, Desert Financial's efforts to provide notice of the new arbitration provision were reasonable.

### 2.  Reasonable Notice Of Opt-Out Rights And Consequences

In addition to providing reasonable notice of the existence of a modification, a business must also provide "reasonable notice of the . . . opportunity to opt out with no change to the status quo business relationship."  *Cornell*, 524 P.3d at 1135.  In *Cornell*, the Arizona Supreme Court elaborated on this requirement by holding that, "[a]t minimum, 'reasonable notice' requires that the initial terms or the notice of the proposed modification expressly indicate the consumer's ability to opt out and that failure to do so manifests the consumer's binding assent."  *Id.* at 1140.

In the initial round of supplemental briefing, Plaintiff argued that Desert Financial's modification effort was necessarily insufficient in light of how *Cornell* interpreted this aspect of the notice requirement.  (Doc. 70 at 12 ["[W]hile the arbitration clause itself purported to provide consumers with the opportunity to opt-out, [Desert Financial] gave Plaintiff no notice about that opportunity.  The banner failed to indicate that the consumer

---

[6]     As explained by the Arizona Supreme Court, "by rejecting an actual notice requirement, Restatement § 3 simplifies business operations and reduces transaction costs to the advantage of all parties concerned."  *Cornell*, 524 P.3d at 1140.  Nevertheless, Plaintiff's experience here informs the totality-of-the-circumstances analysis, because it shows that the removal of the banner on April 1, 2023 from HTML versions of the March 2021 statements did not prevent customers who had opted to receive their monthly statements electronically from actually seeing the banner.

could do anything to prevent the change of terms."].)  Because Desert Financial's initial briefing did not directly address this issue, and in light of its potentially dispositive nature, the Court authorized an additional round of supplemental briefing (Doc. 73), which the parties have now provided (Docs. 74-75).

Having reviewed that briefing, the Court agrees with Plaintiff that Desert Financial failed to provide the sort of opt-out notice that, as interpreted by the Arizona Supreme Court, is required under § 3(a).  Again, *Cornell* holds that, at a minimum, either "the initial terms or the notice of the proposed modification [must] expressly indicate the consumer's ability to opt out and that failure to do so manifests the consumer's binding assent."  524 P.3d at 1140.[7]  Here, Desert Financial's "initial terms" stated in relevant part as follows: "Credit Union may, at any time, change these [terms and conditions] by providing you with the appropriate notice required by law.  By continuing to maintain your accounts at Credit Union after such changes occur, you agree to be bound by these changes."  (Doc. 12-3 at 2.)  This verbiage does not provide the express notice of opt-out rights and consequences that *Cornell* requires.

Although the Court is sympathetic to Desert Financial's arguments to the contrary, they are ultimately unpersuasive.  Saying that a future change can only be accomplished "by providing you with the appropriate notice required by law" is not, as Desert Financial suggests (Doc. 75 at 4-5), the same thing as expressly disclosing the existence of an opt-out right and the consequences of failing to exercise that right.  Not only would it be stretch to assume that consumers inherently know that "the law" affords them a legal right to opt out of future changes to consumer contracts, such that a generic cross-reference to "the law" is enough to provide notice on this topic, but *Cornell* makes clear that such oblique and indirect references are insufficient—the "initial terms" must "expressly indicate" the existence of the opt-out right and the consequences of failing to exercise it.

---

[7]     Desert Financial seems to suggest that Plaintiff's arguments regarding this requirement are based on the "comments by a single justice during oral argument."  (Doc. 75 at 3.)  This characterization is inaccurate—the requirement comes from the text of the Arizona Supreme Court's unanimous opinion.

For similar reasons, there is no merit to Desert Financial's contention that, because its initial terms were worded similarly to the initial terms at issue in *Miracle-Pond v. Shutterfly, Inc.*, 2020 WL 2513099 (N.D. Ill. 2020), which the Arizona Supreme Court cited with approval in *Cornell*, the Court necessarily must find that its initial terms "provided adequate notice."  (Doc. 75 at 4-5.)  *Cornell*'s holding, as set forth in the text of the opinion, is that the "initial terms . . . [must] *expressly* indicate the consumer's ability to opt out and that failure to do so manifests the consumer's binding assent."  524 P.3d 1140 (emphasis added).  Although Desert Financial may be correct that the "see also" citation to *Miracle-Pond* immediately following this holding is enigmatic, because the initial terms in *Miracle-Pond* apparently did not provide express notice of opt-out rights, it is the unambiguous holding set forth in the text of *Cornell* that controls here.  *See, e.g.*, *In re Kirkland*, 915 F.2d 1236, 1238-39 (9th Cir. 1990) ("When interpreting state law, a federal court is bound by the decision of the highest state court."); *Genereux v. Raytheon Co.*, 754 F.3d 51, 57 (1st Cir. 2014) ("[A] federal court sitting in diversity jurisdiction has no roving writ to rewrite [a state supreme] court's pronouncements about state law.  Nor can a federal court make an end run around this boundary by relabeling as dictum what is undeniably a part of a state court's holding.") (citation omitted); *Peña v. Greffet* 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015) ("Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an *Erie* prediction should look first to the words of the state supreme court.").

Under *Cornell*, the only other potential vehicle for providing express notice of opt-out rights and consequences is the "notice of proposed modification."  524 P.3d at 1140.  Here, the relevant notice was the orange-and-blue banner that appeared in Plaintiff's March 2021 statement.  Even though, as explained in Part II.B.1 above, this banner was sufficient to impart reasonable notice of the existence of the *modification*, it did not say anything about *opt-out rights* or the consequences of failing to exercise those rights, let alone provide the sort of express notice on those topics that is required under *Cornell*.

Desert Financial attempts to defend the sufficiency of its approach by arguing that

- 20 -

"the 'notice' Desert Financial provided is not limited to the banner's text.  It also includes information that is accessible via the URL link on the banner."  (Doc. 75 at 2.)  Desert Financial also contends that "[a] contrary interpretation . . . would lead to illogical results." (*Id.* at 3.)  If the Court were writing on a blank slate, these arguments might have more force.  As Desert Financial notes, the relevant provisions, comments, and illustrations in the Restatement § 3 do not specifically say that the notice of opt-out rights must appear in the particular place, so long as the provision of notice as to those rights is reasonable under the totality of the circumstances.  But again, the Court is not writing on a blank slate. *Cornell* unambiguously holds that the "notice of the proposed modification"—and not some other document that is cross-referenced in the notice—must "expressly indicate" the existence of the opt-out right and the consequences of failing to exercise it.  That requirement was not satisfied here.[8]

Accordingly, Desert Financial did not fully satisfy the second element of the § 3(a) modification test.  This means the modification attempt was invalid under § 3(a).

## C.    Third Element: Continuation Of The Business Relationship

The final element for a valid consumer contract modification under § 3(a) is that "the consumer continued the business relationship past a reasonable opt-out period." *Cornell*, 524 P.3d at 1135.  This element requires little discussion—it is undisputed that Plaintiff continued her business relationship with Desert Financial past the April 30, 2021 opt-out date.  *Cornell*, 524 P.3d at 1139 ("Thus, Restatement § 3's central rule is that a business's changes of its standard contract terms are binding on its at-will consumers if (1) the consumers received reasonable notice of the changes and of an opportunity to opt out without penalty; and (2) the consumer continues to do business past a reasonable rejection period.").  Nevertheless, as discussed, the modification attempt was invalid under § 3(a) because Desert Financial did not fully satisfy the second element.

---

[8]    To the extent Desert Financial argues that a "mechanical interpretation" of the rule set forth in *Cornell* would "be inconsistent with the Restatement" (Doc. 75 at 3-4), this argument is directed to the wrong court.  As noted elsewhere in this order, "a federal court is bound by the decision of the highest state court."  *Kirkland*, 915 F.2d at 1238-39

III.     Modification Under § 3(b)

Desert Financial argues that "[i]n addition to the test . . .  under Restatement § 3(a), the Arizona Supreme Court also held that businesses can update their terms without providing an opportunity to opt-out by following an update procedure set forth in the initial terms.  This is based on Restatement § 3(b)."  (Doc. 69 at 13.)  Desert Financial contends that it "also effectively updated its terms under Restatement § 3(b)" because it "plainly followed [the] update procedure from its initial terms . . . by sending Plaintiff notice of the updated terms on her March Statement through the communication channel she elected and explaining how the terms were being updated."  (*Id.*)  Desert Financial also faults Plaintiff for not addressing § 3(b) in her supplemental briefs and argues that Plaintiff's failure to do so amounts to waiver.  (Doc. 72 at 3, 11; Doc. 75 at 5.)

As an initial matter, although Plaintiff's failure to address § 3(b) is frustrating and has complicated the process of resolving the parties' dispute over arbitrability, it does not require a finding of waiver or forfeiture.  Plaintiff has consistently and vociferously opposed Desert Financial's attempt to compel arbitration and identified reasons why the modification attempt should be deemed invalid under § 3 of the Restatement and *Cornell*. A finding of waiver or forfeiture would be inappropriate under these circumstances.

On the merits, the text of § 3(b) provides as follows: "A consumer contract governing an ongoing relationship may provide for a reasonable procedure for adoption of modified terms under which the business may propose a modification of the standard contract terms but may not, to the detriment of the consumer, exclude the application of subsection (a), except that the established procedure may replace the reasonable opportunity to reject the proposed modified term with a reasonable opportunity to terminate the transaction without unreasonable cost, loss of value, or personal burden."  As noted, Desert Financial seems to view § 3(b) as essentially creating a loophole to all of the procedural and other requirements set forth in § 3(a)—under Desert Financial's interpretation, a business would be able to modify a consumer contract in any manner it desired so long as it spelled out, in its initial terms, the procedure that it intended to follow

when pursuing future modifications.

Desert Financial's interpretation lacks merit.  Section 3(b) simply creates an alternative modification process for companies that don't want to be forced to continue their contractual relationships with customers who would prefer to opt out of future modifications, as § 3(a) would ordinarily enable customers to do.  Under § 3(b), such companies are authorized, at least under certain circumstances, to create a modification process that replaces customers' usual opt-out right with a termination option.  This is how the Arizona Supreme Court described § 3(b) in the footnote in *Cornell*.  524 P.3d at 1139 n.2 ("To preserve the at-will nature of the relationship, businesses must be allowed to terminate the relationship if the consumer refuses to accept the new terms.  Accordingly, Restatement § 3 balances consumer and business interests by recognizing this termination power subject to certain requirements: Businesses must expressly reserve this termination power in the agreement's initial terms, and they may exercise it only if termination will not cause 'unreasonable cost, loss of value, or personal burden.'  Restatement § 3(b).").  This is also how § 3(b) is described in the reporters' notes to § 3 of the Restatement: "The business may specify a modification procedure that replaces the opportunity to reject the modified terms (and continue the relationship under the original terms) with an opportunity to terminate the transaction entirely without unreasonable cost, loss of value, or personal burden.  This exception, restated in subsection (b) . . . ."  *Id.*

Critically, § 3(b) provides that this change is the *only* way a company's preferred modification process may deviate from § 3(a)'s usual requirements—it specifies that, "except" for replacing the opt-out right with a termination option, a company's chosen modification procedure "may not, to the detriment of the consumer, exclude the application of subsection (a)."  This interpretation is supported by comment 1 to § 3 of the Restatement, which explains that although "[s]ubsection (b) allows the parties, usually at the instance of the business, to establish in the initial contract a reasonable modification procedure that . . . replace[s] the opportunity to reject with a reasonable opportunity to terminate the transaction entirely," the business's chosen modification procedure still must "satisfy

requirements of assent analogous to those in § 2" and "implement[] these assent requirements."  Further support comes from the reporters' note to § 3 of the Restatement, which clarifies that a business's "specified modification procedures . . . cannot derogate from the requirements of this Section."

With these understandings in mind, Desert Financial's reliance on § 3(b) is misplaced.  Desert Financial did not purport to adopt a modification procedure that would eliminate customers' opt-out rights, as § 3(b) potentially authorizes.  To the contrary, Desert Financial attempted to comply with § 3(a) by offering opt-out rights.  Unfortunately for Desert Financial, that attempt was invalid in light of how *Cornell* interpreted § 3(a)'s requirement of providing reasonable notice of opt-out rights and consequences, but a failed modification attempt under § 3(a) does not somehow transform into a valid modification attempt under § 3(b).  Additionally, the very reason why the modification attempt was invalid—noncompliance with § 3(a)'s notice requirements—forecloses any argument that the modification attempt was valid under § 3(b).  As noted, § 3(b) provides that a company's chosen modification procedure may only "exclude the application of subsection (a)" in one specific way, which is the substantive change of replacing the opt-out right with a termination option.  Even in that scenario (which, again, is not the scenario here), a company must provide reasonable notice in the manner required by § 3(a).  Such notice is what was lacking here.

IV.   Bad Faith Under § 3(c)

Plaintiff argues that, even if the modification attempt otherwise satisfied § 3(a)'s requirements, it would be invalid under § 3(c) because the addition of an arbitration clause qualifies as a bad-faith modification.  (Doc. 70 at 13-15.)  Although it may be unnecessary to resolve this issue in light of the determinations set forth in Parts II and III above, the Court will address it in an attempt to provide a complete record in the event of an appeal.

In *Cornell*, the Arizona Supreme Court explained: "We also recognize that Restatement § 3's position imposes several safeguards to protect consumers from unfair exploitation.  For example, businesses must propose modifications in good faith, and new

terms cannot undermine negotiated parts of the original bargain." 524 P.3d at 1140 (citations omitted). Likewise, § 3(c) of the Restatement provides as follows:

> A modification by the business of a standard contract term in a consumer contract is adopted only if the modification is proposed in good faith, if it is fair and equitable, and if it does not have the effect of undermining an affirmation or promise made by the business that was made part of the basis of the original bargain between the business and the consumer.

*Id.*

Against this backdrop, Plaintiff argues that by adding an arbitration term, which had "no bearing on any subject, issue, right, or obligation addressed in the original contract," Desert Financial abused its modification power to "impose new terms the parties failed to bargain for from the beginning." (Doc. 70 at 14.) In support of this contention, Plaintiff cites *Badie v. Bank of America*, 67 Cal. App. 4th 779 (1998). However, Plaintiff has not identified any Arizona case adopting the rationale set out in *Badie*. Desert Financial emphasizes this point, asserting that "large portions of Plaintiff's argument are copied-and-pasted from her Arizona Supreme Court brief" and that "the Arizona Supreme Court did not adopt Plaintiff's arguments, California law, or *Badie* in articulating the standard for good faith." (Doc. 72 at 12.) On the merits, Desert Financial argues that Arizona has not adopted the California rule and that, under Arizona law, it complied with the good-faith-and-fair-dealing standard because "[a]rbitration has nothing to do with and does not 'impair'" the benefits of Plaintiff's contract with Desert Financial for "financial services." (*Id.*)

As noted elsewhere in this order, "[i]n determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court. If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (internal citations and quotation marks omitted). Under Arizona law, the duty of good faith and fair dealing, and its corollary, bad faith, requires that "each of the parties . . . refrain from any action which would impair the benefits which the other had the right to expect from the contract or the

contractual relationship." *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986). *See also Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1038 (Ariz. 1985) ("The covenant requires that neither party do anything that will injure the right of the other to receive the benefits of their agreement."); *Cavallo v. Phx. Health Plans Inc.*, 518 P.3d 759, 764 (Ariz. 2022) ("The law implies a covenant of good faith and fair dealing in every contract which is a duty that arises by virtue of a contractual relationship. . . . A bad faith claim derives from the duty of good faith and fair dealing.") (cleaned up).

In *Badie*, Bank of America "mailed half-page bill stuffers to its personal credit card and deposit account customers, informing them that, from that time forward, any dispute between a customer and the Bank regarding customer accounts would be resolved either 'by arbitration or by reference' if either the Bank or customer so requested." 67 Cal. App. 4th at 785-86. Despite California's "policy favoring arbitration," the California Court of Appeal rejected the addition of the arbitration provision as a "bad faith" modification to the contract. *Id.* at 788. The court held that Bank of America's inclusion of an arbitration clause violated the duty of good faith and fair dealing because "[w]here, as in this case, a party has the unilateral right to change the terms of a contract, it does not act in an 'objectively reasonable' manner when it attempts to 'recapture' a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into. That is particularly true where the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution." *Id.* at 796 (internal citations omitted).

*Badie* does not compel a finding of invalidity under § 3(c) here. To start, the parties have not cited (and the Court cannot find) any case from the Arizona Supreme Court or the Arizona Court of Appeals suggesting that Arizona courts would follow the rationale set out in *Badie*. Desert Financial argues that because these arguments were made to the Arizona Supreme Court, they were implicitly rejected by that court's failure to mention *Badie* in adopting the good faith and fair dealing section of § 3(c). (Doc. 72 at 12.) This position

is supported by the fact that the Arizona Supreme Court cited two cases that found arbitration provisions to be enforceable modifications. *Cornell*, 524 P.3d at 1140.

*Badie* is also factually distinguishable. There, Bank of America simply provided notice that it was modifying the contractual terms—there was no ability to opt out. Here, in contrast, the arbitration provision required assent through continued use of the Desert Financial banking system and by not submitting an opt-out request by the deadline. Thus, Desert Financial's customers did not face the dilemma addressed in *Badie*, where the term was binding unless a customer closed her account.

Additionally, the addition of an arbitration provision wouldn't undermine the original benefit provided to customers. Comment 7 to Restatement § 3 provides illustrations of when an added contractual term does not "undermine[] the benefit of the bargain guaranteed by the original contract." For example, "a modification is more likely to satisfy subsection (c) if the modified standard terms are simultaneously being offered, as original terms, to new customers. Then, there is less concern that the modification intends to take advantage of consumers who are locked in by the cost of changing the deal." *Id.* Here, Plaintiff still maintains her free checking account, with no disruption to the essential financial services provided by Desert Financial, and Desert Financial sought to have the new arbitration provision apply across-the-board to new and existing customers alike. (Doc. 12-4 at 7 [explaining the opt-out date is either April 30, 2021 "or 30 days after you open your account, whichever is later"].)

Illustration 19 to Restatement § 3 further supports Desert Financial's position as to § 3(c). It explains that if a customer originally purchases songs from an online music store and can store them on seven devices, but later "together with a mandatory software update, the business proposes a modification that allows the consumer to load the tracks to only five devices," and that change applies to already purchased tracks, the change would "violate[] subsection (c) because it retroactively reduces the consumer's benefit from the bargain and partially squanders the consumer's investment in previously purchased tracks." But here, it is difficult to understand how the addition of an arbitration provision

could undermine the essential components of Plaintiff's access to her checking and savings accounts.  *See, e.g.*, *Harrington v. Pulte Home Corp.*, 119 P.3d 1044, 1051 (Ariz. Ct. App. 2005) ("We acknowledge that some arbitration clauses may contain terms that are 'bizarre or oppressive.'  However, there is nothing unusual about the arbitration clause at issue here that would create a question of fact on whether the clause is 'bizarre or oppressive.'") (internal citations omitted); *Rocz v. Drexel Burnham Lambert, Inc.*, 743 P.2d 971, 975-76 (Ariz. Ct. App. 1987) ("Absent an ambiguity in the arbitration provision, and absent oppressive or unconscionable terms, we presume that Rocz assented to the arbitration terms that she should have reasonably expected to be included in this securities contract.").

Plaintiff also argues, again citing California cases, that Desert Financial's modification "amounted to a prospective waiver of the consumer's constitutional right to a jury trial."  (Doc. 70 at 14.)  Desert Financial counters that "Plaintiff fails to cite any Arizona authority for this argument and instead relies on California cases rejecting attempts by employers to unilaterally modify employment contracts" and that the certified questions in this case obviate the need to rely on those California cases considering that the "Arizona Supreme Court just held *in this case* that updating standard terms does *not* make those terms illusory."  (Doc. 72 at 13, citing *Cornell*, 524 P.3d at 1140.)  Desert Financial also notes that the arbitration term only applies prospectively, and, in any event, the arbitration provision's language was clear.  (*Id.* at 13-14.)  Finally, Desert Financial argues "Plaintiff is also wrong on the law" because Arizona law does not create an automatic right to a jury trial.  (*Id.* at 14-15.)

Desert Financial has the better of these arguments.   Although the Arizona Constitution provides that "[t]he right of a trial by jury shall remain inviolate," Arizona courts have interpreted this provision to mean that a person (or entity) has the right to a jury trial when either (1) "afforded by a statute or the constitution," *Williams v. King*, 460 P.3d 303, 307 (Ariz. Ct. App. 2020), or (2) "if such a right existed at common law; it does not create a right where none existed before."  *Smith v. Ariz. Citizens Clean Elections Comm'n*, 132 P.3d 1187, 1196 (Ariz. 2006).  "In Arizona, jury waivers are recognized as

commonplace such that they typically 'attract no attention.'  It has been said that the right to a jury trial in civil matters is 'a privilege which may be waived by either party and not an absolute right.'  There are typically no procedural obstacles for obtaining a jury waiver in a civil case, and such waiver may be the consequence where parties simply fail to timely request a jury.  It follows that parties may include such waiver provisions in their contractual agreements." *BNCCORP, Inc. v. HUB Int'l Ltd.*, 400 P.3d 157, 162-63 (Ariz. Ct. App. 2017).  *See also Gregory G. McGill, P.C. v. Ball*, 519 P.3d 729, 733 (Ariz. Ct. App. 2022), *review denied* (Apr. 4, 2023) ("Ball argues the superior court erred in confirming the arbitration award because he never agreed to waive his constitutional right to a jury trial.  But Ball necessarily waived his right to a jury trial by signing a fee agreement providing for arbitration."); *Harrington*, 119 P.3d at 1052 ("Indeed, an agreement to submit disputes to arbitration is necessarily an agreement to forego dispute resolution by a jury.").

Plaintiff's final bad-faith argument is that Desert Financial "knowingly added an arbitration provision after Plaintiff's claim had accrued, simply adding to the already enumerated reasons why burying notice of the change was anything but reasonable." (Doc. 71 at 7.  *See also* Doc. 70 at 14-15.)  In response, Desert Financial argues that "the arbitration provision did *not* apply retroactively but instead only applied prospectively to how claims filed in the future would be resolved." (Doc. 72 at 14.)

These circumstances do not demonstrate bad faith.  As an initial matter, there is no evidence that Desert Financial was aware of Plaintiff's intent to file this lawsuit at the time it modified its Terms to add the arbitration provision, such that the addition might somehow be viewed as an attempt to thwart this particular lawsuit.  And even if Desert Financial had been aware of Plaintiff's plans, it expressly gave her the right to opt out of the arbitration provision while maintaining her accounts (albeit while not providing the sort of notice of the opt-out right required by *Cornell*).  It is difficult to understand how this approach could be categorized as a bad-faith attempt to interfere with Plaintiff's litigation plans.

…

…

V.     Conclusion

Desert Financial's modification attempt was invalid under § 3(a) because Desert Financial failed to comply with how *Cornell* construed § 3(a)'s notice requirement pertaining to opt-out rights and consequences.  The modification attempt was also invalid under § 3(b), both due to Desert Financial's failure to comply with § 3(a) and for the additional reason that Desert Financial wasn't purporting to follow the alternative modification process contemplated by § 3(b).  Thus, even though Plaintiff is incorrect that the modification attempt would otherwise be invalid under § 3(c), Plaintiff is not bound by the arbitration provision and Desert Financial cannot compel her to arbitrate her claims in this action.

Accordingly,

**IT IS ORDERED** that Desert Financial's motion to compel arbitration (Doc. 11) is **denied**.

Dated this 31st day of July, 2023.

Dominic W. Lanza
United States District Judge