**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Eva Cornell,

        Plaintiff,

v.

Desert Financial Credit Union, et al.,

        Defendants.

No. CV-21-00835-PHX-DWL

**ORDER**

In this putative class action, Eva Cornell ("Plaintiff") alleges that Desert Financial Credit Union ("Desert Financial") violated certain federal regulations by failing to clearly explain, in the opt-in form related to its overdraft protection program, that overdraft fees will be assessed when the "available" balance (rather than "ledger" balance) of a customer's account falls below zero. (Doc. 1.) Desert Financial has, in turn, moved to dismiss for lack of jurisdiction and for failure to state a claim. (Doc. 78.)

For the reasons that follow, the Court agrees with Desert Financial that Plaintiff lacks standing—she does not allege that she read the allegedly confusing form before choosing to opt into Desert Financial's overdraft protection program, does not allege or avow that she would have declined to opt into the program if Desert Financial's reliance on the available-balance approach had been spelled out more clearly in the opt-in form, and would have incurred the disputed overdraft fee(s) even if Desert Financial followed a ledger-balance approach. Due to the presence of these factual features, this case involves an "asserted informational injury that causes no adverse effects," and as the Supreme Court

1    recently clarified, such an injury "cannot satisfy Article III." *TransUnion LLC v. Ramirez*,

2    594 U.S. 413, 422 (2021).  The determination that Plaintiff lacks standing also makes it

3    unnecessary to resolve Desert Financial's alternative Rule 12(b)(6) dismissal arguments.

**BACKGROUND**

4

5    I.    Factual Allegations

6        The following facts, presumed true, are derived from the Complaint (Doc. 1) and

7    certain documents incorporated by reference in the Complaint.  (Docs. 1-1, 12.)

8        On October 22, 2018, Plaintiff applied for a "membership savings" account with

9    Desert Financial.  (Doc. 1 ¶ 65; Doc. 12-1 at 2-3.)

10        During the application process, Plaintiff also opted into Desert Financial's overdraft

11   protection program.  (Doc. 1 ¶ 65.)  As part of the opt-in process, Plaintiff was provided a

12   separate form (the "Opt-In Form") entitled "What You Need To Know About Overdrafts

13   And Overdraft Fees," which provides in part that "[a]n overdraft occurs when you do not

14   have enough money in your account to cover a transaction, but we pay it anyway."  (Doc.

15   1 ¶ 57; Doc. 1-1 at 2.)  The Opt-In Form further provides that overdraft fees may be up to

16   $35 for ATM or debit overdrafts.  (Doc. 1-1 at 2.)  Plaintiff does not allege that she actually

17   read the Opt-In Form before choosing to enroll in the overdraft protection program.  (*See*

18   Doc. 1 ¶ 65.)[1]

19        Desert Financial is one of many financial institutions that assesses overdraft fees

20   based on "available balance" rather than "account" or "ledger" balance (hereinafter,

21   "ledger balance").  (*Id.* ¶¶ 52, 55.)  Ledger balance refers to "the actual amount of the

22   account holder's money in the account at any particular time."  (*Id.* ¶ 39.)  In contrast,

23   "available balance" is a "term of art in the financial industry" that refers to the ledger

24   balance minus any money the bank or credit union has held from deposits or held from the

25   account because of authorized debit transactions that have not yet come in for payment.

26   (*Id.*)

27   _____

28   [1]    Plaintiff does not dispute this interpretation of the Complaint in her response to the
motion to dismiss.  (Doc. 79 at 7-8 [not disputing Desert Financial's assertion that "she
does not plead that she read . . . the Opt-In Form"].)

- 2 -

Between May 14-20, 2020, Plaintiff was assessed a total of nine overdraft fees of $35 each.  (Doc. 1 ¶ 66; Doc. 12-5 at 3.)  Although the Complaint alleges that "those overdraft fees have not been refunded to Plaintiff" (Doc. 1 ¶ 66), the account statement reflects that eight of the nine $35 fees were reversed on May 20, 2020, such that Plaintiff paid only a single $35 overdraft fee (Doc. 12-5 at 3).

Although "Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2020," when she met with her attorney.  (Doc. 1 ¶ 68.)

II.    Procedural History

On May 5, 2021, Plaintiff filed the Complaint.  (Doc. 1.)  The Complaint asserts two causes of action: (1) violation of "Regulation E," which is a regulation promulgated by the Consumer Financial Protection Bureau ("CFPB"); and (2) violation of the Arizona Consumer Fraud Act ("ACFA").  (Doc. 1 ¶¶ 84-98.)  As discussed in more detail below, Plaintiff's essential argument is that Regulation E requires a financial institution that wishes to charge overdraft fees to provide a clear and understandable notice regarding those fees; that Desert Financial's Opt-In Form failed to provide the required clear and understandable notice, because it did not explain that overdraft fees would be assessed based on the customer's available balance rather than the customer's ledger balance; and that Desert Financial therefore failed to obtain her "valid affirmative consent," as required under Regulation E, and committed consumer fraud.

During the early stages of the case, Desert Financial moved to compel arbitration. (Doc. 11.)  That request, although ultimately unsuccessful, resulted in significant delays while the parties engaged in arbitration-related litigation, including a trip to the Arizona Supreme Court (to address a certified question) and a trip to the Ninth Circuit (to address Desert Financial's interlocutory appeal from the resulting denial of its arbitration demand).

On August 14, 2023, while the arbitration-related litigation was still ongoing, Desert Financial filed the pending motion to dismiss.  (Doc. 78.)

On August 28, 2023, Plaintiff filed a response.  (Doc. 79.)

Before Desert Financial could file a reply, the case was stayed based on Desert

1    Financial's pursuit of the arbitration-related interlocutory appeal.  (Docs. 80-81.)

2         On April 23, 2025, following the remand from the Ninth Circuit, Desert Financial

3    filed a reply.  (Doc. 89.)

4         On August 22, 2025, the Court issued a tentative ruling.  (Doc. 91.)

5         On September 3, 2025, the parties stipulated to vacate oral argument and issue a

6    final order based on the tentative ruling.  (Doc. 92.)

7                                    **DISCUSSION**

8    I.    <u>Legal Standard</u>

9         "[S]tanding is an essential and unchanging part of the case-or-controversy

10   requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

11   "[T]he irreducible constitutional minimum of standing contains three elements.  First, the

12   plaintiff must have suffered an injury in fact—an invasion of a legally protected interest

13   which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

14   hypothetical.  Second, there must be a causal connection between the injury and the

15   conduct complained of—the injury has to be fairly traceable to the challenged action of the

16   defendant, and not the result of the independent action of some third party not before the

17   court.  Third, it must be likely, as opposed to merely speculative, that the injury will be

18   redressed by a favorable decision."  *Id.* at 560-61 (cleaned up).  "The plaintiff, as the party

19   invoking federal jurisdiction, bears the burden of establishing these elements.  Where, as

20   here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating

21   each element."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up).

22        "Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional

23   allegations in one of two ways.  A 'facial' attack accepts the truth of the plaintiff's

24   allegations but asserts that they are insufficient on their face to invoke federal jurisdiction."

25   *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted).  "A 'factual'

26   attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by

27   introducing evidence outside the pleadings."  *Id.*

28        Here, Desert Financial has proffered extrinsic evidence to challenge Plaintiff's

1   standing: Exhibit 1 is a copy of Plaintiff's application for a savings account; Exhibit 2 is a
2   copy of Plaintiff's application for a checking account; Exhibit 3 is a copy of Desert
3   Financial's "Statement of Terms, Conditions, and Disclosures" ("STCD") that was in effect
4   at the time Plaintiff submitted her account applications; Exhibit 4 is a copy of Desert
5   Financial's "current STCD"; Exhibit 5 is a copy of Plaintiff's "account statement for the
6   statement period April 21, 2020 to May 20, 2020"; Exhibit 6 is a copy of Plaintiff's
7   "account statement for the statement period February 21, 2021 to March 20, 2021"; Exhibit
8   7 is a copy of Plaintiff's "account statement for the statement period March 21, 2021 to
9   April 20, 2021"; Exhibit 8 is a copy of Plaintiff's "eStatement Member Information,
10  showing that [Plaintiff] opted to receive electronic notifications and statements regarding
11  her account"; and Exhibit 9 is a copy of "the Consent to Electronic Delivery of Information
12  that [Plaintiff] acknowledged when opting in to eStatements, which updated Exhibit 8
13  when [Plaintiff] opted into electronic communications."  (Docs. 12, 12-1 through 12-9.)
14  Because Desert Financial's attack on Plaintiff's standing is factual rather than facial, the
15  Court may consider these documents.  *Clark v. Eddie Bauer LLC*, 2024 WL 177755, *3
16  (9th Cir. 2024) ("Eddie Bauer asserts a 'factual attack on jurisdiction,' by submitting an
17  affidavit attesting that it changed the above-described pricing representations seven months
18  before Clark filed her complaint.") (cleaned up).

19  II.   Relevant Legal Background

20       In 1978, Congress enacted the Electronic Fund Transfer Act ("EFTA") "to provide
21  a basic framework establishing the rights, liabilities, and responsibilities of participants in
22  electronic fund and remittance transfer systems," with "[t]he primary objective . . . [being]
23  the provision of individual consumer rights."  15 U.S.C. § 1693(b).

24       Under 15 U.S.C. § 1693c(a), "[t]he terms and conditions of electronic fund transfers
25  involving a consumer's account shall be disclosed at the time the consumer contracts for
26  an electronic fund transfer service."  *Id.*  EFTA further requires that such disclosures be
27  "in readily understandable language."  *Id.*  Finally, EFTA also requires that such
28  disclosures be "in accordance with regulations" issued by the CFPB.  *Id.*  *See also* 15

U.S.C. § 1693b; *Tims v. LGE Community Credit Union*, 935 F.3d 1228, 1243 n.11 (11th Cir. 2019) ("Congress reassigned responsibility for enforcing EFTA from the Federal Reserve Board to the CFPB in 2010.").

One such regulation issued by the CFPB is 12 C.F.R. §§ 1005 *et seq.*, also known as Regulation E. The specific portion of Regulation E at issue in this case is § 1005.17, entitled "Requirements for overdraft services." It provides in relevant part:

> (b) **Opt-in requirement**—
>
> > (1) **General**. Except as provided under paragraph (c) of this section, a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:
> >
> > > (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;
> > >
> > > (ii) Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;
> > >
> > > (iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and
> > >
> > > (iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent.

*Id.*

Regulation E further provides that "the notice required by paragraph (b)(1)(i) of this section shall be substantially similar to Model Form A-9." 12 C.F.R. § 1005.17(d). Model Form A-9, which is entitled "What You Need to Know about Overdrafts and Overdraft Fees," provides in relevant part that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." 12 C.F.R. § Pt. 1005, App. A-9.

Regulation E also requires that all disclosures "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1).

Consumers alleging violations of EFTA or its implementing regulations have a cause of action arising under EFTA. 15 U.S.C. § 1693m. However, 15 U.S.C. § 1693m(d)(2) provides a safe harbor from liability "if a financial institution utilized an appropriate model clause." *Id.*

### III.    The Parties' Arguments

Desert Financial argues that Plaintiff "does not allege that she suffered any concrete injury from the Opt-In. She does not allege that she read the Opt-In, that she was confused by it, or that she misunderstood the Opt-In required Desert Financial to use ledger balance for overdrafts. She does not allege that she relied on the Opt-In to conduct her financial affairs or even that she remembered it." (Doc. 78 at 7.)[2] Desert Financial further argues that although "the Complaint specifically alleges that Desert Financial's use of available balance instead of ledger balance can 'result[] in overdraft fees paid even in instances when there is enough money in an account to cover a transaction,'" "Plaintiff never alleges this happened to her." (*Id.* at 8, emphasis omitted.) "In fact, Plaintiff's monthly statements establish that Desert Financial did not assess any overdraft fees when Plaintiff's ledger balance was positive" and only assessed those fees when Plaintiff had already overdrawn the ledger balance. (*Id.* at 8-9.) Finally, Desert Financial contends that it "voluntarily waived the eight overdraft fees it had assessed on the prior four days" and Plaintiff "thus fails to allege that she personally suffered an injury traceable to the allegedly inaccurate Opt-In," which further "forecloses Plaintiff's standing." (*Id.* at 9.)

In response, Plaintiff argues that "incurring multiple overdraft fees after [Desert Financial's] failure to make the proper disclosures prior to opting her into its Regulation E overdraft program . . . constitute[s] concrete injury." (Doc. 79 at 4.) Plaintiff further argues

---

[2]    Desert Financial also argues that Plaintiff "alleges the opposite," citing paragraph 27 of the Complaint, which alleges that "[m]ore than 50% of those assessed overdraft fees do not recall opting into an overdraft program." (Doc. 1 ¶ 27.) The Court does not read this paragraph as an affirmative allegation that Plaintiff herself does not recall opting in.

that although Desert Financial "claims to have reimbursed Plaintiff . . . even if the Court took [Desert Financial's] word for it at this stage, [Desert Financial] cites nine incurred fees but reimbursements for only eight." (*Id.*)  Alternatively, Plaintiff argues that "even without a monetary injury," she has established an "informational injury" because Desert Financial's "inaccurate disclosures caused specific 'downstream consequences,' denying her the ability to give affirmative and informed consent to enrolling in its overdraft service program," which caused an "increase in risk" of the type Congress sought to prevent by enacting EFTA.  (*Id.* at 5-6.)  Plaintiff also argues that Desert Financial "overreads the traceability requirement," which requires only "a relationship between the injury and illegal conduct."  (*Id.* at 6-7.)  Last, Plaintiff argues that although Desert Financial "suggests that Plaintiff does not have standing because she does not plead that she read or relied on the Opt-In Agreement," "the circumstances of Plaintiff's reliance are inherent in the transaction."  (*Id.* at 7.)

In reply, Desert Financial argues that although Plaintiff contends she "was still assessed one overdraft fee and therefore suffered a concrete injury," "this argument misses the mark because" "Plaintiff alleges that the Opt-In Form discloses that Desert Financial uses ledger balance to assess overdrafts," "Plaintiff admits that she opted into [Desert Financial's] overdraft program," "every transaction that Plaintiff challenges in the Complaint overdrew Plaintiff's ledger balance," and "[t]he overdraft fees Plaintiff incurred are thus not fairly traceable to the challenged conduct, because she received what she allegedly wanted."  (Doc. 89 at 9-10.)  Next, Desert Financial contends that Plaintiff's alleged "informational injury" is insufficient under *TransUnion* and the cases applying its principles because "Plaintiff does not allege that she read, misunderstood, was confused by, or relied on the Opt-In Form in any way.  Nor, crucially, does Plaintiff allege that she would have opted-out had she understood Desert Financial uses available balance instead of ledger balance."  (*Id.* at 10.)  Desert Financial argues that "Plaintiff does not address any of these cases" but instead relies on lower-court cases from outside the Ninth Circuit that "failed to address and are contrary to the U.S. Supreme Court's decision in *TransUnion*."

(*Id.* at 11.)  Desert Financial concludes that "[g]iven that Plaintiff has not even alleged she read the Opt-In Form, the Court cannot presume that if she had read the form, she would have understood Desert Financial used ledger balance (not available balance), and further presume that she would not have opted in to overdraft coverage had she known Desert Financial used available balance." (*Id.*)

IV. <u>Analysis</u>

The Court begins by analyzing whether Plaintiff has standing to assert the only federal claim set forth in the Complaint, which is the claim in Count One for violating Regulation E. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross.  Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.") (cleaned up).  If that claim is subject to dismissal for lack of standing, there is no need to address Plaintiff's standing to pursue the state-law consumer fraud claim in Count Two, as Plaintiff does not allege that diversity jurisdiction exists and contends that supplemental jurisdiction exists over Count Two under 28 U.S.C. § 1367 only by virtue of the presence of the federal claim in Count One.  (Doc. 1 ¶ 19.)  Thus, if Count One is dismissed for lack of standing, Count Two must be dismissed as well.  *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 664 (9th Cir. 2002) ("[W]ith the dismissal of Scott's federal constitutional claim for lack of standing, we have no authority to retain jurisdiction over Scott's state law claims."); *Herman Fam. Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001) ("If the district court dismisses all federal claims on the merits, it has discretion under § 1367(c) to adjudicate the remaining claims; if the court dismisses for lack of subject matter jurisdiction, it has no discretion and must dismiss all claims.").

A. **Economic Injury**

Plaintiff contends she suffered an economic injury sufficient to confer standing because she was assessed nine overdraft fees of $35 each.

As an initial matter, although the Complaint alleges that Plaintiff was never refunded those fees (Doc. 1 ¶ 66), Plaintiff's account statements clearly show that Desert

Financial refunded eight of the fees within days of Plaintiff incurring them, before Plaintiff was required to pay them, and before the commencement of this litigation. (Doc. 12-5 at 3.) Even so, that leaves one unrefunded overdraft fee of $35, which constitutes a sufficiently concrete and particularized injury. *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) ("Economic injury is clearly a sufficient basis for standing."); *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing.").

The problem for Plaintiff is that this economic injury is not fairly traceable to Desert Financial's challenged conducted. Although Plaintiff need not, at the motion-to-dismiss stage, show that her alleged harm was "proximately caused" by Desert Financial's challenged conduct, she still "must establish a line of causation between [Desert Financial's] action and [her] alleged harm that is more than attenuated." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (cleaned up).

Plaintiff's theory is that the Opt-In Form is misleading because it is written to suggest that overdraft fees will only be assessed when the ledger balance is negative, when in fact overdraft fees are assessed when the available balance is negative. (Doc. 1 ¶¶ 51, 94.) But as Plaintiff's account statements show, all nine of the overdraft fees were assessed when both her ledger and available balances were negative. (Doc. 12-5 at 2-3.) Thus, there is no "line of causation"—let alone a line of causation that is "more than attenuated"— between Plaintiff's economic injury and the allegedly misleading language in the Opt-In Form. *Maya*, 658 F.3d at 1070. Plaintiff would have been assessed the overdraft fee (indeed, all nine overdraft fees) regardless of whether Desert Financial used the available-balance or ledger-balance approach for assessing such fees.

Nor is there any merit to Plaintiff's contention that she "may well have declined enrollment" in Desert Financial's overdraft protection program if the Opt-In Form had clearly disclosed Desert Financial's intention to utilize her available balance, rather than her ledger balance, when assessing overdraft fees. (Doc. 79 at 6-7.) True, a lack of enrollment would have precluded Desert Financial from assessing any overdraft fees

- 10 -

against Plaintiff, but Plaintiff does not allege that she read the Opt-In Form. A change in the wording of a form that Plaintiff was given, but chose to ignore, could not have influenced her subsequent decision whether to opt into the program described in that form. *Cf. Oh v. Collecto, Inc.*, 2021 WL 3732881, \*3-4 (D.N.J. 2021) (concluding that the plaintiff lacked standing to assert a claim under the Fair Debt Collection Practices Act premised on purportedly "confusing" passages in a collection letter the defendant sent her because she "testified that she had not seen the letter" and if she "had never seen or read the allegedly violative letter, it could not have confused her about her rights, or otherwise harmed her").

Furthermore, even if Plaintiff had read the Opt-In Form, she conspicuously does not allege in the Complaint—and did not attempt to claim in a declaration submitted in response to the motion to dismiss—that she would have declined to opt into the overdraft protection program if she had known that overdraft fees would be assessed based on her available balance rather than ledger balance. As noted, the only passing reference to this issue in Plaintiff's filings is an assertion by her attorneys, in her response brief, that she "may well have declined" enrollment if the issue had been properly disclosed to her. (Doc. 79 at 6-7.) This approach is insufficient because "arguments and statements of counsel are not evidence." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (cleaned up). *See also Contreras v. Toyota Motor Sales U.S.A. Inc.*, 484 F. App'x 116, 118 (9th Cir. 2012) ("[D]espite the fact that Toyota made a factual challenge to standing, plaintiffs did not present evidence—even through verified complaint—to establish injury-in-fact, although it was their burden to establish standing. Therefore, the district court did not err in dismissing the complaint for lack of standing.") (cleaned up).

Moreover, even accepting this assertion on its own terms, it is too equivocal and speculative to establish standing. *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990) ("[A] litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements. A federal court is powerless to create its own jurisdiction by

embellishing otherwise deficient allegations of standing."); *Nat'l Fed'n of Blind v. Arizona Bd. of Regents*, 2009 WL 3352332, *5 (D. Ariz. 2009) ("The fact that some of Shandrow's tuition money might have been used to support the Kindle DX program is insufficient to establish standing because the Court will not speculate on . . . what injury might have occurred.") (cleaned up).  The assertion by Plaintiff's attorneys acknowledges that she "may" have opted into the overdraft protection program even if the allegedly confusing passages in the Opt-In Form had been clarified.  This provides another reason why Plaintiff has failed to establish the requisite non-attenuated line of causation between the challenged conduct and her economic injury.  *See, e.g.*, *Sanchez v. Irwindale Brew Yard, LLC*, 2024 WL 4434793, *1-2 (C.D. Cal. 2024) (concluding that the plaintiff lacked standing to assert "technical statutory violations related to the format of disclosures provided to consumers in advance of procurement or collection of the consumers' credit information" because "the court cannot infer from the allegations that Plaintiff would have taken a particular action because of the alleged inadequate disclosures, much less that Plaintiff would have been injured by that action"); *Grabner v. Experian Info. Sols., Inc.*, 2022 WL 1223636, *1, *3 (C.D. Cal. 2022) (concluding that the plaintiffs lacked standing to pursue a claim under the Fair Credit Reporting Act ("FCRA") premised on the defendant's failure to provide certain "information required by law, including . . . that the consumer may wish to contact a State or local consumer protection agency or State attorney general for more information," because "Plaintiffs have not alleged that they had some reason to contact state authorities, [or] would have done so if the requisite information was provided"); *Nunley v. Cardinal Logistics Mgmt. Corp.*, 2022 WL 5176867, *1, *3 (C.D. Cal. 2022) (concluding that the plaintiff lacked standing to pursue a claim under the FCRA, which was premised on the defendant's failure to provide certain disclosures to the plaintiff before obtaining the plaintiff's consent to obtain consumer reports related to the plaintiff, because the complaint did "not allege that plaintiff suffered any actual confusion resulting from the purportedly noncompliant disclosures or that plaintiff would have taken any action if Defendants had complied with the FCRA"); *Littlejohn v. Phoenix Title Loans LLC*, 2021 WL 120897, *3

(D. Ariz. 2021) ("Plaintiff's alternative theory of liability alleges that the TILA disclosure given to Plaintiff does not accurately describe the terms of Plaintiff's loan . . . [but] Plaintiff never describes how this disclosure failure injured her. . . . [S]he never states that she actually would have changed her behavior had Defendant given her an accurate TILA disclosure.  Accordingly, the SAC has not alleged a concrete injury or risk of such an injury adequately to grant her Article III standing for her second claim.").[3]

It is true, as Plaintiff emphasizes in the Complaint, that "[m]any courts have already found that failing to clearly and accurately describe an overdraft program in an opt-in disclosure agreement can constitute a Regulation E violation." (Doc. 1 ¶ 51 & n. 13.)  But the mere fact that the plaintiffs in other cases had standing to pursue Regulation E claims does not mean that Plaintiff also has standing to pursue such a claim here.  The facts matter when it comes to standing.  *See generally Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) ("The standing inquiry is both plaintiff-specific and claim-specific.").  To that end, the Court's review of other cases in which challenges related to overdraft-fee practices were allowed to proceed suggests that the plaintiffs in those cases—unlike Plaintiff here—routinely alleged or established that they would not have incurred the overdraft fees if the bank had utilized the ledger-balance approach.  *See, e.g.*, *Tims v. LGE Community Credit Union*, 935 F.3d 1228, 1235 (11th Cir. 2019) ("LGE allegedly charged Tims overdraft fees

---

[3]    Desert Financial also proffers two cases that provide persuasive support for its position. *Tedards v. Ducey*, 951 F.3d 1041, 1069 (9th Cir. 2020) (plaintiff lacked standing to challenge a state statute dictating the process for appointing a U.S. Senator in the event of a vacancy because Governor Ducey "would have appointed Senator McSally regardless of the requirement that he name an interim senator and regardless of the requirement that the appointee share Senator McCain's political party"); *Aikens v. Portfolio Recovery Assocs., LLC*, 2017 WL 1091591, *2 (E.D.N.Y. 2017), *aff'd and remanded*, 716 F. App'x 37 (2d Cir. 2017) ("Plaintiff amassed a debt that she failed to pay.  After acquiring that debt, PRA entered into a monthly payment plan with Plaintiff, which Plaintiff authorized and agreed to, whereby PRA would debit Plaintiff's checking account each month.  Now, Plaintiff seeks to obtain money damages from PRA for allegedly violating the EFTA by not obtaining Plaintiff's agreement in writing.  There is no concrete injury here.  Plaintiff authorized PRA to withdraw money from her account to repay the debt she owed.  PRA did not take more money than was agreed to.  Nor did they withdraw the money from any other account than that which Plaintiff authorized.  The Court fails to see how Plaintiff suffered any injury here whatsoever.").  Although those cases do not expressly focus on the traceability element of the standing test, they still support the proposition that a plaintiff cannot establish traceability when the complained-of harm would have occurred even if the defendant had followed the procedures advocated by the plaintiff.

of $ 30.00 each on two occasions.  Tims's complaint alleged that at the time LGE assessed the overdraft fees, her ledger balance was sufficient to cover each transaction."); *Leslie v. Redstone Fed. Credit Union*, 2021 WL 2017295, *3, *9-10 (N.D. Ala. 2019) (rejecting challenge to plaintiff's standing, where the plaintiff "alleged that the overdraft fees she was charged specifically violated what is known as the 'Opt-In Rule' of Regulation E," where "Redstone charged an overdraft fee to Leslie's account after she authorized a payment in the amount of $18.88 from her checking account" and "her account would not have had a negative balance but for the fact that Redstone employed the available balance method when it calculated her balance . . . [and] if Redstone had instead used the ledger balance method . . . her account would not have been negative, and she would not have been assessed an overdraft fee"); *Lussoro v. Ocean Fin. Federal Credit Union*, 456 F. Supp. 3d 474, 479 (E.D.N.Y. 2020) ("[O]n July 19, 2018, Plaintiff used her debit card in two transactions, one in the amount of $2.77 and the other in the amount of $3.11.  At that time, Plaintiff had sufficient funds in her account to cover these transactions . . . [but on] July 20, 2018, Defendant, pursuant to its policy of posting different types of charges in a specific order, posted a $197 charge that significantly decreased the amount of money available in Plaintiff's account.  Therefore, later on July 20, 2018, when the charges from July 19, that had been previously authorized, were settled, there was not enough money in Plaintiff's account to cover these charges and she was assessed two $28 overdraft fees.") (citations omitted); *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1, 6 (D.D.C. 2016) ("On March 20, 2015, a debit card transaction for $59.99 was posted against Chambers' actual balance of $67.74.  Although her [ledger] balance was sufficient to cover the transaction, apparently her available balance was not, because the Credit Union charged her an overdraft fee of $32.") (citations omitted); *In re: TD Bank, N.A.*, 150 F. Supp. 3d 593, 601 (D.S.C. 2015) ("TD Bank treated transactions that caused the 'available balance' to fall below zero, or to remain below zero, as an 'overdraft.'  TD Bank then assessed the associated overdraft fees without regard to the actual balance, which was still positive."). In light of these authorities, and using a dash of common sense, the Court cannot see how,

under the facts of this case, Plaintiff's economic injury could be fairly traceable to Defendant's allegedly misleading Opt-In Form.

Plaintiff's counterarguments and cited authorities are unavailing. Plaintiff argues that Desert Financial "overreads the traceability requirement" to require tort causation when "[a]ll it requires is a relationship between the injury and illegal conduct." (Doc. 79 at 6-7.) But as discussed above, although proximate causation is not required in this context, *Maya* still requires a "line of causation" that is "more than attenuated." There is no line of causation between an allegedly misleading Opt-In Form that Plaintiff never read, and whose contents Plaintiff does not allege or avow had any bearing on her opt-in decision, and an overdraft fee that would have been assessed under either approach for determining whether her account was overdrawn.

For additional support, Plaintiff relies on *Fludd v. S. State Bank*, 566 F. Supp. 3d 471 (D.S.C. 2021). There, the plaintiff alleged that the bank's use of Model Form A-9 was misleading in light of its practice of assessing overdrafts on the basis of available balance. *Fludd*, 566 F. Supp. 3d at 479-80. The bank argued, as Desert Financial argues here, that the plaintiff could not establish traceability because "the only transaction relied upon . . . in the amended complaint overdrew her account regardless of which type of balance South State utilized." *Id.* at 479. The court disagreed, explaining:

> [T]he Court finds that [the defendant's] standing challenge conceives of [the plaintiff's] injury too narrowly. The requirements imposed by Regulation E on the contents of opt-in agreements are specifically designed to provide consumers with sufficient clarity about the terms of an overdraft program to make an informed choice about whether to join the program. The gravamen of [the plaintiff's] claim is that [the defendant's] Opt-in Agreement violated Regulation E because the language it used to describe when an overdraft would occur—namely, "when you do not have enough money in your account to cover a transaction, but we pay it anyway"—did not match the reality of the available balance accounting method, which assessed overdraft fees even when sufficient money remained in the account and the Bank did not need to advance its own funds. Thus, [the plaintiff's] alleged injury includes the fact that she was enrolled in a point-of-sale debit card overdraft program without having the terms of that program accurately disclosed, putting her at an increased risk of overdrafts, when she may well have

declined enrollment if the Opt-in Agreement had been "clear and readily understandable." This is enough to plausibly allege standing for a Regulation E violation, and the motion to dismiss on this basis is denied.

*Id.* (cleaned up).

Although *Fludd* contains some similarities to this case, it is non-precedential and does not, in any event, support Plaintiff's position on closer inspection. As noted, the district court in *Fludd* accepted the plausibility of the plaintiff's assertion that if the bank's opt-in form had been worded differently, she "may well have declined enrollment" in the overdraft protection program. *Id.* In that alternative scenario, no overdraft fees could have been assessed against the plaintiff regardless of how her account balance was calculated—instead, the bank would simply decline to process transactions that might result in an overdraft (and resulting overdraft fees). This alternative scenario was plausible in *Fludd* because the operative complaint in that case contained specific allegations that raised a plausible inference that the affected plaintiff had read, and been confused by, the bank's opt-in form. *Fludd v. S. State Bank*, Civ. Action No. 2:20-cv-1959-BHH (D.S.C.), Doc. 35 ¶ 95 ("A second contract was also required for Defendant to collect overdraft fees on certain types of transactions. (See Opt-in Agreement, Dkt. No. 1-3.) Further, whether that contract was entered into or not by customers, based on information and belief, Defendant made a concerted effort to have all customers read and review the contract.") But that alternative scenario is not plausible here because, as discussed above, the Complaint does not allege that Plaintiff read the Opt-In Form (or contain any other factual allegations that raise a plausible inference that she read the Opt-In Form) and Plaintiff does not allege or avow that she would have declined to opt into the overdraft protection program if she knew that fees would be assessed based on her available (rather than ledger) balance. Thus, unlike in *Fludd*, no change in the wording of that form could have possibly affected her opt-in decision.

B.    **Informational Injury**

Plaintiff also contends she suffered an informational injury because Desert Financial's "inaccurate disclosures . . . den[ied] her the ability to give affirmative and

*informed* consent to enrolling in its overdraft service program," which resulted in an "increase in risk" of the type Congress sought to prevent by enacting EFTA. (Doc. 79 at 5-6.)

Shortly after Plaintiff filed the Complaint, the Supreme Court in *TransUnion* addressed the requirements for establishing informational injuries. There, the defendant mistakenly placed alerts on credit reports for thousands of consumers, suggesting they were a "potential match" to names on a government list of suspected terrorists. *TransUnion*, 594 U.S. at 420-21. A class action followed under the FCRA. *Id.* at 430. Although only a subset of class members had this false terrorist designation disclosed to a third party, all class members claimed statutory damages. *Id.* at 431-33. Addressing the subset of plaintiffs who had their false designations disclosed, the Supreme Court held that they had established injuries sufficient for standing. *Id.* at 432-33. The Court explained that "[c]entral to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts— such as physical harm, monetary harm, or various intangible harms including . . . reputational harm" and that because the disclosure of the false designations to third parties closely resembled the "harm associated with the tort of defamation," it had "no trouble concluding that [those plaintiffs] suffered a concrete harm that qualifies as an injury in fact." *Id.* at 417, 432.

The Supreme Court next addressed whether the subset of class members who did not have their false designations disclosed to a third party had Article III standing. *Id.* at 433-34. The Court held that they did not. *Id.* at 442. The Court explained that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 434. Addressing the plaintiffs' alternative argument that the false designations created a "risk of real harm" that these plaintiffs "were at risk of not learning about the . . . alert in their credit files" and "were thus at risk of not being able to correct their credit files before TransUnion disseminated credit reports containing the misleading information to third-party businesses," the Court explained that "the risk of

future harm on its own does not support Article III standing for the plaintiffs' damages claim." *Id.* at 441.

Last, the Court addressed an argument that "the plaintiffs suffered a concrete 'informational injury' under" *Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998), and *Public Citizen v. Department of Justice*, 491 U.S. 440 (1989). *Id.* at 441. The Court rejected that argument for several reasons, explaining:

> The plaintiffs did not allege that they failed to receive any required information. They argued only that they received it in the wrong format. Therefore, *Akins* and *Public Citizen* do not control here. In addition, those cases involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information. This case does not involve such a public-disclosure law. Moreover, the plaintiffs have identified no "downstream consequences" from failing to receive the required information. They did not demonstrate, for example, that the alleged information deficit hindered their ability to correct erroneous information before it was later sent to third parties. An "asserted informational injury that causes no adverse effects cannot satisfy Article III."

*Id.* at 441-42 (citations omitted).

### 1. Denial Of Informed Consent

Plaintiff appears to argue that being "denied her ability to give informed consent" constitutes a downstream consequence of the allegedly misleading Opt-In Form.

In *Norvell v. Blue Cross & Blue Shield Ass'n*, 2021 WL 5542169 (9th Cir. 2021), the Ninth Circuit rejected a similar argument. There, the plaintiff alleged that the defendants violated various federal statutes and regulations by insufficiently defining "outpatient" versus "inpatient" in certain healthcare plan materials. *Id.* at *1. The plaintiff alleged that, as a result, he was "unable to understand and compare health benefits plans and [could not] exercise an informed choice among them" as required by 5 U.S.C. § 8907(a). *Id.* The district court dismissed the lawsuit for lack of standing and the Ninth Circuit affirmed, explaining that "even if we assume that the statutes at issue were established to protect his interests, [the plaintiff] failed to allege any procedural violations that caused him concrete harm." *Id.* In support of this conclusion, the court cited the

passage in *TransUnion* that "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *Id.*

Similarly, in *Rodriguez v. U.S. Healthworks, Inc.*, 813 F. App'x 315 (9th Cir. 2020), the plaintiff asserted an FCRA claim premised on a confusingly written disclosure statement. *Id.* at 316. However, because "the record contains no allegation or evidence that [the plaintiff] was confused by the disclosure statement *and would not have signed it if it were sufficiently clear*," the Ninth Circuit concluded that she "did not suffer informational injury" and "did not otherwise suffer a risk of material harm to any concrete interest." *Id.* (emphasis added).

If a plaintiff who actually read the challenged forms still cannot, under *Norvell* and *Rodriguez*, establish an informational injury premised on a resulting lack of informed consent, it is difficult to see how Plaintiff—who does not allege that she even read the challenged form and does not, at any rate, allege or avow that she would have declined to opt into the overdraft protection program if the allegedly confusing passage had been clarified—could do so. Other courts have likewise held that a plaintiff cannot satisfy the requirement of showing "downstream consequences" or "adverse effects" by alleging a denial of an ability to give informed consent. *Howard v. LVNV Funding, LLC*, 2025 WL 1530761, *5 (W.D. Pa. 2025) ("Here, even if the [proof of claim] did omit the amount of the Howards' debt that consisted of interest and fees, the Howards have not identified any downstream consequence or adverse effect flowing from that omission. Rather, the only 'adverse effect' cited by the Howards is that 'by failing to provide reliable and truthful information, [LVNV and Resurgence] . . . necessarily frustrated Plaintiffs' ability to make informed decisions.' But having their ability to make informed decisions generically 'frustrated' is not enough to give the Howards standing. If it was, then . . . every omission of required information would be actionable.") (cleaned up); *Granados v. OnPoint Cmty. Credit Union*, 2023 WL 3570039, *4 (D. Or. 2023) (rejecting plaintiff's assertion that she had standing to assert EFTA violations "because she has been deprived of information . . . that Congress and the regulators want her to have so she can make

- 19 -

informed decisions" because she failed to identify any "concrete harm resulting from the Account Agreement's purported unlawful waiver of rights guaranteed by the EFTA" and, "[a]s in *TransUnion*, . . . has not alleged any ways in which OnPoint's misinformation affected her") (cleaned up).

Plaintiff's arguments and authorities do not suggest otherwise.  In *Lundstrom v. Young*, 2022 WL 15524624 (S.D. Cal. 2022), the plaintiff's wife (unbeknownst to the plaintiff) prepared several documents for the purpose of obtaining ownership of the benefits from plaintiff's 401(k) plan and employee stock option plan.  *Id.* at *1-2.  The wife then sent these documents to the plaintiff's employer, who forwarded them to the plaintiff.  *Id.*  The employer, however, failed to provide the plaintiff with copies of the employer's "processing procedures."  *Id.*  Later, while the plaintiff's challenges to the validity of the documents were pending in state court, the plaintiff's employer distributed the stock options and 401(k) benefits to the plaintiff's wife, totaling more than $4 million, all pursuant to the employer's procedures.  *Id.*  The plaintiff sued his employer for violating a disclosure provision of ERISA.  *Id.* at *15.  The employer moved to dismiss for lack of standing but the district court denied this request on the ground that the plaintiff had demonstrated an "informational injury," explaining as follows:

> Plaintiff alleges that [his employer's] failure to provide him information required under ERISA caused him harm because he did not know the "time limits" that were set by the plan administrator for making determinations, and that *if he had this information, he would have better been able to "evaluate his options in contesting the validity of the orders in state court versus other venues."*  He also was unable to "evaluate the proper court to apply to for relief or whether [his employer] had internal administrative procedures available."  Thus, Plaintiff has identified "downstream consequences" from the informational injury he has suffered under ERISA.

*Id.* at *16 (emphasis added).

*Lundstrom*, in addition to being non-binding, is distinguishable from this case for an array of reasons.  There, the employer failed to provide a required form to the plaintiff until after a critical deadline had elapsed.  Here, Desert Financial provided the Opt-In Form

to Plaintiff in advance of the opt-in decision, only for Plaintiff to proceed to opt in without reading the form.  In a related vein, the alleged informational injury in *Lundstrom* wasn't interference with the plaintiff's ability to provide "informed consent" to participation in the program described in the missing form—rather, it was that the plaintiff failed to take certain actions in other forums as a result of not receiving the form.  That is different from Plaintiff's claim here, which, again, is a claim premised on the how the allegedly misleading nature of the Opt-In Form, which she was provided but didn't read, somehow affected her subsequent decision to opt into the program described in that unread form.  As noted above in earlier portions of this order, courts have not hesitated to find a lack of standing under analogous circumstances.  *See also Nelson v. Pacwest Energy LLC*, 2018 WL 3575832, *5 (D. Ariz. 2018) (concluding that "the allegations related to Plaintiffs' alleged actual harm in the FAC are insufficient to establish standing under the EFTA" where "Plaintiffs do not allege that Fisher misunderstood the terms of the Authorization . . . in any way").

Consequently, to the extent Plaintiff bases her informational injury on her inability to give informed consent, that injury reduces to nothing more than "a bare procedural violation, divorced from any concrete harm," and cannot serve as a basis for standing. *Spokeo*, 578 U.S. at 341.

### 2.    Increased Risk Of Overdrafts

Plaintiff also appears to argue that the "increase in risk" of unexpected overdraft fees is the downstream consequence of Desert Financial's improper disclosure.  (Doc. 79 at 6.)

Even accepting that Congress passed EFTA to protect against this sort of harm, a plaintiff must still satisfy the strictures of Article III.  *Spokeo*, 578 U.S. at 341 ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.  Article III standing requires a concrete injury even in the context of a statutory violation.").

Additionally, *TransUnion* clarifies that in a suit for damages, "the risk of future harm on its own does not support Article III standing." 594 U.S. at 441. There, the plaintiffs argued that the defendant's misleading disclosures "exposed them to a material risk" of future harm. *Id.* at 435. Nevertheless, in the course of analyzing whether the plaintiffs had sustained a cognizable informational injury, the Supreme Court concluded that the plaintiffs "identified no 'downstream consequences' from failing to receive the required information." *Id.* at 442. Here, too, Plaintiff has not identified the sort of "downstream consequence" required for an informational injury. *See also Greenstein v. Noblr Reciprocal Exch.*, 2024 WL 3886977, *2 (9th Cir. 2024) ("Where, as here, Plaintiffs have not sufficiently alleged that their personal information was actually stolen, they cannot rely on the increased risk such a theft might have posed had it occurred.").

Plaintiff's cited cases do not compel a different conclusion. (Doc. 79 at 5-7 & n.2.) As an initial matter, all of those cases are from outside the Ninth Circuit except for one: *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017). Furthermore, all but one of the cases, including *Van Patten*, predate *TransUnion*.

Plaintiff's cited cases are also distinguishable for other reasons. In *Van Patten*, a plaintiff received a series of unsolicited text messages as part of the defendant's marketing campaign. *Van Patten*, 847 F.3d at 1040-41. The plaintiff then brought a putative class action under the Telephone Consumer Protection Act of 1991 ("TCPA"). *Id.* at 1040. The defendant moved to dismiss for lack of jurisdiction, arguing that the plaintiff could not demonstrate an injury-in-fact sufficient for standing. *Id.* at 1042. The court disagreed, holding that the plaintiff had "alleged a concrete injury in fact sufficient to confer Article III standing." *Id.* at 1043. The court explained that "the telemarketing text messages at issue here, absent consent, present the precise harm and infringe the same privacy interests Congress sought to protect in enacting the TCPA. Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress has identified.'" *Id.* (citation omitted).

It is unclear why Plaintiff believes this outcome supports her position. The plaintiff in *Van Patten* did not argue—nor did the court hold—that a mere increase in the *risk* of future unsolicited telecommunications was sufficient for standing purposes. Rather, the plaintiff alleged several instances of *actual*, unsolicited text communications that infringed her privacy interests, and the court based its holding on those allegations.

Next, in *Curtis v. Propel Prop. Tax Funding*, LLC, 915 F.3d 234 (4th Cir. 2019), the plaintiff "alleged that he was required to agree to EFT [electronic fund transfer] authorization as a condition of [an agreement signed with his property tax lender] and that [that agreement] contained terms requiring him to waive EFTA's substantive rights regarding EFT withdrawal." *Id.* at 241. The plaintiff argued that the defendant thus violated 15 U.S.C. §1693k(2) of EFTA, which provides that no person may "require a consumer to establish an account for receipt of electronic fund transfers with a particular financial institution as a condition of employment or receipt of a government benefit," and § 1693l of EFTA, which prevents financial institutions from including EFTA waivers in their agreements. *Id.* at 239-40 & n.5. The defendant moved to dismiss for lack of jurisdiction but the district court denied the motion and the Fourth Circuit affirmed, explaining:

> Propel contends that Curtis's injury is hypothetical because Curtis has not yet made an EFT payment or attempted to retract his EFT authorization. This argument mischaracterizes the injury. Curtis satisfies the injury requirement because he alleged that he was required to agree to EFT authorization as a condition of the [agreement] and that the [agreement] contained terms requiring him to waive EFTA's substantive rights regarding EFT withdrawal; whether he made EFT payments or attempted to withdraw EFT authorization is irrelevant.

*Id.* at 241. The court went on:

> And even if we accept Propel's premise that Curtis has not yet been injured, Curtis would still have standing to challenge the [agreement] immediately because there is a "realistic danger" that Curtis will "sustain[ ] a direct injury" as a result of the terms of the [agreement]. Specifically, because Propel allegedly required Curtis to agree to preauthorized EFTs, when the time comes for Curtis to pay Propel, he will either need to make an EFT payment

or attempt to withdraw his EFT authorization in response.    Therefore, Curtis's injury is "actual or imminent" for purposes of standing.

*Id.* at 241-42.

Plaintiff does not explain why she believes *Curtis*, which involved a suit under different EFTA provisions, supports her position here.  Perhaps her reliance is based on the second paragraph cited above, which suggests that an increase in the risk of EFTA-related economic harm suffices to establish standing.    However, that analysis predates *TransUnion*, in which the Supreme Court emphasized that "the risk of future harm on its own does not support Article III standing."  594 U.S. at 441.  Moreover, the risk of injury in this case is far different than in *Curtis*.    There, the plaintiff was forced to enroll in electronic fund transfers and also waived his right to withdraw from that program.  The Court found this created an imminent risk of injury, stating that "*when the time comes for Curtis to pay Propel*, he will either need to make an EFT payment or attempt to withdraw his EFT authorization in response."  *Id.* at 241-42 (emphasis added).  This language suggests such an outcome was inevitable.  That is not so here, where a chain of several contingencies would have to occur before Plaintiff would be assessed a future overdraft fee based on a negative available balance.

Finally, as for *Adams v. Liberty Bank*, 2021 WL 3726007 (D. Conn. 2021), the standing analysis in that case was confined to a footnote and did not mention *TransUnion*. *Id.* at *5 n.3.  Additionally, the court's basis for finding standing—the rest of the standing discussion in the footnote was dicta—was that the plaintiff's "allegations plausibly suggest that Liberty's failure clearly to explain its overdraft policy in the opt-in notice led to her being charged an overdraft fee on a one-time credit card transaction on March 16, 2020." *Id.*  For the reasons discussed at length in earlier portions of this order, this case is factually different—Plaintiff does not allege that she read the Opt-In Form, does not allege or avow that she would have declined to opt into the overdraft protection program if the Opt-In Form had more clearly disclosed Desert Financial's intention to assess overdraft fees based on the available balance, and would have incurred the single $35 overdraft fee that wasn't

reversed even under the ledger-balance approach.[4]

In short, Plaintiff has "identified no . . . downstream consequences from [her] receipt of allegedly misleading communications that failed to mislead. Absent any such concrete impact, [she] can complain only about *receiving* information that had no impact on [her]. . . . [A]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020). Consequently, Plaintiff has not established an informational injury.

Because Plaintiff lacks standing, it would be inappropriate to address Desert Financial's alternative merits-based dismissal arguments under Rule 12(b)(6). *Moore v. Maricopa Cnty. Sheriff's Office*, 657 F.3d 890, 895 (9th Cir. 2011) ("[T]he Supreme Court has specifically instructed that a district court must first determine whether it has jurisdiction before it can decide whether a complaint states a claim."). The Complaint is dismissed without prejudice due to a lack of standing. *Fleck & Associates, Inc. v. City of Phoenix*, 471 F.3d 1100, 1106-07 (9th Cir. 2006) (dismissals for lack of subject-matter jurisdiction are always without prejudice).[5]

---

[4]     As for the remaining out-of-circuit cases cited by Plaintiff, *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337 (4th Cir. 2017), merely stands for the proposition that, for purposes of analyzing concreteness, courts should consider whether Congress sought to prevent the relevant type of harm from occurring. *Id.* at 346. *Strubel v. Comenity Bank*, 842 F.3d 181 (2d Cir. 2016), involved dissimilar facts and merely cited *Spokeo* for the pre-*TransUnion* proposition that a "risk of real harm" suffices to establish a concrete injury for standing. *Id.* at 190.

[5]     In her response brief, Plaintiff includes, in a footnote, a fleeting request "to conduct jurisdictional discovery prior to the Court's ruling." (Doc. 79 at 4 n.1.) Putting aside that this is not the correct way to request such relief, *see* Fed. R. Civ. P. 7(b)(1), this request fails on the merits. Plaintiff makes no effort to specify the discovery she would seek if granted such leave, let alone explain how that unspecified discovery would make any difference in the standing analysis. *See, e.g., Mackovich v. U.S. Government*, 2008 WL 2053978, *1 (E.D. Cal. 2008) ("Plaintiff has made no showing that if further discovery were allowed, the outcome of the resolution of Defendant's motion to dismiss would be affected. Accordingly, Plaintiff's motion for a continuance to conduct further discovery is denied."); *Rosenstein & Sons. Co. v. BBI Produce. Inc.*, 123 F. Supp. 2d 268, 275 (M.D. Pa. 2000) ("While it is true that a plaintiff should be allowed discovery of relevant jurisdictional facts, Rosenstein has not made a proffer explaining what it wishes to discover . . . ."). Furthermore, as discussed throughout this order, much of the standing analysis turns on information within Plaintiff's own control, such as whether she read the Opt-In Form and whether she would have declined to opt into the overdraft protection program if the Opt-In Form had more clearly disclosed that overdraft fees would be assessed based on her available balance. Plaintiff did not need permission to engage in jurisdictional discovery to explore those topics—she could have just included relevant allegations in the

V.    <u>Leave To Amend</u>

Plaintiff requests leave to amend in the event of dismissal.  (Doc. 79 at 17.)  Desert Financial argues this request "should be denied as futile" because Plaintiff's claims fail as a matter of law for various merits-related reasons.  (Doc. 89 at 11.)

The Ninth Circuit has stated that "[R]ule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality.'"  *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citation omitted).  *See also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  Accordingly, the Court will give Plaintiff an opportunity to plead new facts in an attempt to cure the standing-related deficiencies identified in this order.

Accordingly,

**IT IS ORDERED** that:

1.    Desert Financial's motion to dismiss (Doc. 78) is **granted**.  The Complaint is dismissed without prejudice.

2.    Plaintiff may, within 14 days of the issuance of this order, file a First Amended Complaint ("FAC").  The FAC may include only changes from the Complaint that are intended to remedy the deficiencies identified in this order.  If Plaintiff chooses to file a FAC, she must also file, as an exhibit, a redlined version that indicates how the FAC differs from the Complaint.

3.    If Plaintiff does not file a FAC within 14 days of the issuance of this order, the Clerk shall enter judgment accordingly and terminate this action.

Dated this 8th day of September, 2025.

_____
Dominic W. Lanza
United States District Judge

---

Complaint or submitted a declaration in response to the motion to dismiss.  *Cf. McRo, Inc v. Activision Blizzard, Inc.*, 2013 WL 6571618, *14 (D. Del. 2013) (recommending denial of motion to engage in jurisdictional discovery that was not "premised on the need for information that is wholly out of the plaintiff's own control").